# United States Court of Appeals for the Federal Circuit

---

## IN RE ST. HELENA HOSPITAL

---

### 2014-1009

---

Appeal from the United States Patent and Trademark Office, Trademark Trial and Appeal Board in Serial No. 85/416,343.

---

Decided: December 16, 2014

---

BRADLEY P. HEISLER, Heisler & Associates, of Roseville, California, argued for appellant.

CHRISTINA J. HIEBER, Associate Solicitor, argued for appellee. With her on the brief were NATHAN K. KELLEY, Solicitor and THOMAS L. CASAGRANDE, Associate Solicitor.

---

Before LOURIE, LINN and O'MALLEY, *Circuit Judges*.

LINN, *Circuit Judge*.

St. Helena Hospital ("St. Helena") appeals from the decision of the Trademark Trial and Appeal Board ("the Board") in *In re St. Helena Hosp.*, Serial No. 85/416,343, 2013 WL 5407267 (T.T.A.B., June 25, 2013). The Board affirmed the examiner's rejection of St. Helena's application to register "TAKETEN," under 15 U.S.C. § 1052(d) (2012), as likely to cause confusion with the mark "TAKE

10!" shown in United States Registration No. 2,577,657 ("the '657 Registration"). Because the Board erred in its determination of likelihood of confusion, we reverse and remand.

BACKGROUND

St. Helena conducts a 10-day residential health improvement program at its in-patient facility in St. Helena, California. The program is identified by the mark "TAKETEN." St. Helena applied to the United States Patent and Trademark Office ("PTO") to register the mark. St. Helena's application identifies the service as "[h]ealth care services, namely, evaluating weight and lifestyle health and implementing weight and lifestyle health improvement plans in a hospital-based residential program" in class 44. *St. Helena*, 2013 WL 5407267, at *1.

The examiner refused to register St. Helena's mark, citing a likelihood of confusion with the "TAKE 10!" mark shown in the '657 Registration and commonly owned U.S. Registration No. 2,674,182 ("the '182 Registration") for the mark "TAKE 10! (and Design)." *Id.* Both of the cited registrations are for "printed manuals, posters, stickers, activity cards and educational worksheets dealing with physical activity and physical fitness" in class 16. *Id.* The registration for "TAKE 10! (and Design)" also identifies goods in class 9, namely, "pre-recorded videocassettes featuring physical activity and physical fitness promotion programs."

St. Helena appealed to the Board,[1] which analyzed the likelihood of confusion between the "TAKETEN" and

---

[1] At the time of the Board's review, renewal documents were due but not yet filed for the '182 Registration. *St. Helena*, 2013 WL 5407267, at *1 n.2. The Board

"TAKE 10!" marks by examining the first four of the factors discussed in *Application of E.I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973), namely: (1) the similarity or dissimilarity of the marks in terms of appearance, sound, meaning and commercial impression; (2) the similarity or dissimilarity and nature of the goods and services; (3) the similarity or dissimilarity of established, likely-to-continue channels of trade; and (4) the conditions under which and buyers to whom sales are made, i.e., degree of consumer care. *St. Helena*, 2013 WL 5407267, at *1–5. The Board found that the balance of the factors supported the conclusion of likelihood of confusion and affirmed the examiner's refusal to register St. Helena's mark.

St. Helena appeals. We have jurisdiction pursuant to 15 U.S.C. § 1071(a)(1) and 28 U.S.C. § 1295(a)(4)(B).

DISCUSSION

The PTO may refuse to register a trademark that so resembles a registered mark "as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1052(d). "Whether a likelihood of confusion exists is a question of law, based on underlying factual determinations." *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002) (quoting *Recot, Inc. v. M.C. Becton*, 214 F.3d 1322, 1326 (Fed. Cir. 2000)). To determine the likelihood of confusion, the Board and this court consider the "relevant" *DuPont* factors. *In re Viterra, Inc.*, 671 F.3d 1358, 1361 (Fed. Cir. 2012) ("Not all of the *DuPont* factors are relevant to every case, and only factors of significance to the particular mark need be considered." (quoting *In re Mighty Leaf Tea*, 601 F.3d

therefore did not consider it in its initial analysis, *id.*, nor do we.

1342, 1346 (Fed. Cir. 2010))). The PTO bears the burden of showing that a mark should not be registered. *See* 15 U.S.C. § 1052 ("No trademark . . . shall be refused registration . . . unless . . . .").

## I. Standards of Review

"This court reviews the Board's conclusions on questions of law without deference." *Hewlett-Packard*, 281 F.3d at 1265 (citing *Recot*, 214 F.3d at 1327). We review the Board's factual findings for substantial evidence, which "requires that this court ask whether a reasonable person might accept that the evidentiary record adequately supports the Board's conclusion." *Id.* (citing *On-Line Careline, Inc. v. America Online, Inc.*, 229 F.3d 1080, 1085 (Fed. Cir. 2000)).

## II. Analysis

We address, in turn, each of the *DuPont* factors considered by the Board.

### a. Similarity or Dissimilarity of the Marks

The Board found that the marks are similar in appearance, sound, meaning and commercial impression. *St. Helena*, 2013 WL 5407267, at *3. In particular, the Board concluded that the marks are "phonetically identical." *Id.* at *2. It also found that, in context, the word "ten" and the numeral "10" "mean the same thing," and, in context, both marks refer to taking a break from work. *Id.* The Board acknowledged that St. Helena's specimen advertises that spending "ten days with us can put you on the road to a lifetime of good health," and that registrant's specimen advertises "Healthier Lifestyles 10 Minutes at a Time." *Id.* at *2. Finally, the Board found that the difference between the word "ten" and the numeral "10" in the marks was "minimal," and concluded that the similarity of the marks supports the conclusion of likelihood of confusion. *Id.*

St. Helena argues that the Board erred. St. Helena focuses on the three differences in appearance between "TAKETEN" and "TAKE 10!," namely that (1) in "TAKETEN" the number is spelled out rather than written as a numeral; (2) in "TAKETEN" there is no space between the two words; and (3) "TAKETEN" does not end in an exclamation mark. The PTO argues that these differences are insufficient for consumers to recognize the marks as distinct.

St. Helena is correct that there are differences in appearance between registrant's and applicant's marks. But marks "must be considered . . . in light of the fallibility of memory" and "not on the basis of side-by-side comparison." *San Fernando Elec. Mfg. Co. v. JFD Elecs. Components Corp.*, 565 F.2d 683, 685 (C.C.P.A. 1977). There is nothing in the record to persuade us that any of the differences argued by St. Helena meaningfully distinguish the appearance of the respective marks. Accordingly, we agree with the Board's conclusion that the differences in appearance are minimal.

Regarding differences in sound, St. Helena argues that the exclamation mark in "TAKE 10!" alters the pronunciation of the marks because the registered mark must be uttered emphatically, whereas "TAKETEN" would be spoken in a relaxed fashion. The PTO, quoting *Viterra*, responds that "there is no correct pronunciation of a trademark, and consumers may pronounce a mark differently than intended by the brand owner." 671 F.3d at 1367. We are not persuaded that the exclamation mark alters the pronunciation of the cited mark in any significant way, and, thus, have no basis to question that aspect of the Board's decision.

Regarding differences in connotation, St. Helena argues that based on the respective specimens in the record, "TAKE 10!" implies taking ten minutes out of your day whereas "TAKETEN" connotes a ten-day health and

fitness program. The PTO responds that both specimens connote taking a break for purposes of health and fitness and that St. Helena's argument inappropriately focuses on extrinsic evidence of actual use. The Board relied on a dictionary definition of "take ten" to conclude that both marks connote taking a break, especially from work. *St. Helena*, 2013 WL 5407267, at \*2 n.3.

Substantial evidence supports the Board's determination that registrant's and applicant's marks have similar connotations. The registration for "TAKE 10!" covers printed materials "dealing with physical activity and physical fitness." *Id.* at \*1. St. Helena's application covers "[h]ealth care services, namely, evaluating weight and lifestyle health and implementing weight and lifestyle health improvement plans in a hospital-based residential program." *Id.* While the specimens refer to days and minutes, respectively, neither identification specifies a certain period of time or suggests any specific meaning of the word "TEN" or the numeral "10." Since "the question of registrability of an applicant's mark must be decided on the basis of the identification of goods set forth in the application regardless of what the record may reveal as to the particular nature of an applicant's goods," we agree with the Board's finding that both marks engender similar connotations. *See Octocom Sys., Inc. v. Houston Computer Servs., Inc.*, 918 F.2d 937, 942 (Fed. Cir. 1990) (citing cases).

Finally, St. Helena argues that the commercial impressions are different, contending that the registered mark "TAKE 10!" is more of a shout or command as compared to the suggestion engendered by St. Helena's mark "TAKETEN." St. Helena points to the TRADEMARK MANUAL OF EXAMINING PROCEDURE ("TMEP") § 807.12(a)(ii), which notes that the deletion of the question mark from "GOT MILK?" "would constitute a material alteration because it changes the commercial impression from a question to a statement." St. Helena

also relies heavily on *Coach Services, Inc. v. Triumph Learning LLC*, 668 F.3d 1356 (Fed. Cir. 2012), where this court affirmed a Board decision that two marks for "COACH" were not similar because of different connotations and commercial impressions. The PTO argues that the exclamation mark in this case does not change the commercial impression because, if anything, it only changes the emphasis, and not the meaning of the phrase "take ten." The PTO argues that the example of "GOT MILK?" is distinguishable because the question mark in that context actually changes the meaning.

Here, the record only reflects one definition for the phrase "take ten." This distinguishes this case from *Coach*, where we noted that "the word 'coach' . . . has many different definitions in different contexts." 668 F.3d at 1369. This case is, therefore like "most cases[,] where the addition of an exclamation point does not affect the commercial impression of a mark." TMEP § 807.14(c). Accordingly, we agree that both marks engender similar commercial impressions.

At bottom, substantial evidence supports the Board's conclusion that the first *DuPont* factor points towards a likelihood of confusion. However, "we note that similarity is not a binary factor but is a matter of degree." *In re Coors Brewing Co.*, 343 F.3d 1340, 1344 (Fed. Cir. 2003). Here, there are some, albeit modest, differences between the two marks.

b. Similarity or Dissimilarity and Nature of the Goods and Services

The Board next considered the similarity or dissimilarity and nature of the goods and services. This factor considers whether "the consuming public may perceive [the respective goods and services of the parties] as related enough to cause confusion about the source or origin of the goods and services." *Hewlett Packard*, 281 F.3d at 1267 (citing *Recot*, 214 F.3d at 1329).

The Board concluded that consumers are likely to believe that health care services and "similarly marked" printed materials come from the same source or are somehow connected with or sponsored by a common company based on several examples of organizations that render health care services and distribute printed materials. *St. Helena*, 2013 WL 5407267, at *3. It further found that St. Helena's services and the registrant's printed materials "would be encountered by the same persons under conditions and circumstances that could, because of the similarity of the marks, cause them to believe that they emanate from the same source." *Id.* at *4. The Board recognized that in the context of food products associated with restaurants this court requires "something more" than the fact that similar or identical marks are used. *Id.* (quoting *Coors*, 343 F.3d at 1345 (itself quoting *Jacobs v. Int'l Multifoods Corp.*, 668 F.2d 1234, 1236 (C.C.P.A. 1982)). But the Board asserted that "[i]n this case, there is no 'something more' standard." *Id.*

St. Helena argues that the Board lacked substantial evidence to conclude that consumers would mistakenly believe that the registrant's goods and the applicant's services come from the same source. St. Helena first contends that while the Board identified several instances in which written materials were provided in connection with services similar to St. Helena's services, the printed materials are either different from those listed in the "TAKE 10!" registration or unrelated to physical activity and physical fitness. Moreover, St. Helena argues that some of the cited printed materials do not bear the mark used by the service provider. The PTO responds that the respective goods and services are complementary because they can be used together. The PTO further contends that the complementary nature of health care services and printed materials in general makes them so related that consumers will be led to believe they have a common source or origin. Finally, it contends that printed materi-

als distributed by programs such as St. Helena's will bear the same mark or name as the facility offering the program.

Substantial evidence does not support the PTO's assertion that the cited printed materials distributed as part of a weight loss program bear the same mark or name as the facility offering the program. The majority of references discussed by the Board are not included in the record, and, accordingly, we cannot determine whether the printed materials feature the respective facility's trademarks. Of the two printed materials that are in the record, the newsletter of the Duke Diet & Fitness Center bears Duke's logo, but the exercise routine worksheets of Hilton Head Health do not. And the Duke newsletter is not within the listed class of goods and services for the '657 Registration, i.e., "printed manuals, posters, stickers, activity cards and educational worksheets dealing with physical activity and physical fitness," which makes it less probative. Accordingly, the Board's assertion that it is "inconceivable" that health services do not include trademarks on their handouts, *St. Helena*, 2013 WL 5407267, at *4, which is inconsistent with the Hilton Head example, is, at best, conclusory and unsupported. This assertion, therefore, merits no deference. *See Nat'l Shooting Sports Found. v. Jones*, 716 F.3d 200, 214 (D.C. Cir. 2013) ("We do not defer to an agency's 'conclusory or unsupported suppositions.'") (quoting *McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1187 (D.C. Cir. 2004)).

What the references relied on by the examiner do show is that printed materials are used "in connection" with various health services programs. Appellee's Brief at 3; *St. Helena*, 2013 WL 5407267, at *3. But, as we explained in *Shen Mfg. Co. v. Ritz Hotel, Ltd.*, the mere fact that goods and services are "used together" does not, on its own, show relatedness. 393 F.3d 1238, 1244 (Fed. Cir. 2004) (quoting *Packard Press, Inc. v. Hewlett-Packard*

*Co.*, 227 F.3d 1352, 1358 (Fed. Cir. 2000)). Rather, to rely on the similarity of the goods and services as a basis for refusing registration, the PTO must come forth with a persuasive evidentiary showing of relatedness between the goods and services at issue. *Compare Shen*, 393 F.3d at 1245 (finding no correlation because "aside from the fact that these goods are used together, there is no indication that the consuming public would perceive them as originating from the same source") *with In re Shell Oil Co.*, 992 F.2d 1204, 1207 (Fed. Cir. 1993) (finding a correlation based on evidence of "overlap of consumers").

As we have long held, "each case must be decided on its own facts and the differences are often subtle ones." *Jacobs*, 668 F.2d at 1236 (quoting *Indus. Nucleonics Corp. v. Hinde*, 475 F.2d 1197, 1199 (C.C.P.A. 1973)) (internal citations removed). In circumstances in which the types of goods and services in question are well-known or otherwise generally recognized as having a common source of origin, the PTO's burden to establish relatedness will be easier to satisfy. *See Coors*, 343 F.3d at 1347 (stating that a mark for a brewpub "would clearly be related" to a mark for beer); *Hewlett-Packard*, 281 F.3d at 1268 (holding that a registration for "electronic transmission of data and documents via computer terminals" is "closely related" to a registration "covering facsimile machines, computers, and computer software"). That is not the case here. In situations like the present, in which the relatedness of the goods and services is obscure or less evident, the PTO will need to show "something more" than the mere fact that the goods and services are "used together." *Shen Mfg.*, 393 F.3d at 1244. It is for this reason that this court, in *Coors*, reversed a Board determination that there was likelihood of confusion between a registered mark for "BLUE MOON" for restaurant services and an application for "BLUE MOON" for beer. 343 F.3d at 1340. *Coors* explained that the fact that "some restaurants sell private label beer" does not alone imply that consumers will

assume that beer served in a restaurant has the same source of origin as the restaurant services. *Id.* at 1345–46. "Something more" was required to show relatedness in the circumstances of that case. While we have applied the "something more" standard in the past in the context of restaurant services, the rule is not so limited and has application whenever the relatedness of the goods and services is not evident, well-known or generally recognized.

In this case, the PTO has not shown that St. Helena's services and the '657 Registration's printed materials are generally recognized as being related, nor has it shown "something more" to establish relatedness in the circumstances of this case. The Board's conclusion that St. Helena's services "are related" to registrant's goods, *St. Helena*, 2013 WL 5407267, at *4, thus lacks substantial evidence.

### c. Similarity or Dissimilarity of Established, Likely-to-Continue Channels of Trade

The Board rejected St. Helena's argument that the registered goods would be limited to educators, because the registrations did not limit the channels of trade. *St. Helena*, 2013 WL 5407267, at *5. Accordingly, it found that "the identified goods are offered in all channels of trade which would be normal therefor." *Id.* The Board did not separately state whether the factor of the channels of trade thus suggested a likelihood of confusion or was merely neutral. *See id.* at *3–5.

St. Helena argues that the trade channels are different. It contends that because the registration describes the relevant goods or services as "printed manuals, posters, stickers, activity cards and educational worksheets dealing with physical activity and physical fitness," the relevant trade channel is limited to educators. The PTO replies that "educational" modifies only "worksheets" and the printed manuals, posters, stickers and activity cards

are intended for non-educators as well. The PTO further argues that St. Helena's service includes an educational component, and thus would still share trade channels, even if the cited registration's goods were directed only to educators. Finally, the PTO argues that "the specimens of use in the record reflect that both St. Helena's services and the registrant's goods are promoted through similar channels, such as websites generally searchable and available on the Internet."

Both sides' evidence regarding the channels of trade is lacking. St. Helena's argument that the goods of the cited registration are directed to educators rests on a false premise. While some of the registration's listed goods may be directed to educators, the PTO is correct that not all of the goods are so limited. The PTO goes too far, however, in claiming that because both St. Helena's services and the registrant's goods are promoted through websites, the channels of trade are similar. Advertising on the Internet is ubiquitous and "proves little, if anything, about the likelihood that consumers will confuse similar marks used on such goods or services." *Kinbook, LLC v. Microsoft Corp.*, 866 F. Supp. 2d 453, 470–71 n.14 (E.D. Pa. 2012) (quoting J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 24:53.50 (4th ed. Supp. 2011)).

### d. Degree of Consumer Care

The Board conceded that customers of St. Helena's services "will exercise a high degree of care." *St. Helena,* 2013 WL 5407267, at *5. However, the Board found no basis to conclude that the consumers would exercise that level of care in analyzing printed materials received while participating in the services. *Id.* The Board thus considered the factor of consumer care to be neutral.

St. Helena argues that the Board erred in assuming that St. Helena's consumers would become less discriminating once in the program. St. Helena contends that on

the contrary, given that its customers are immersed in a hospital-based residential program, the consumers are likely to become more familiar with St. Helena's mark and less likely to confuse it with the registrant's mark. The PTO responds that the Board properly concluded that evidence of consumer care in selecting St. Helena's services is distinct from evidence of the degree of care consumers would exercise once in the program.

The Board's conclusion here is not supported by substantial evidence. The record contains no evidence to support a conclusion that the level of care exercised by consumers before entering a health-care program is any different from the level of care exercised once in the program. The Board's conclusory and unsupported supposition to the contrary merits no deference. *See Nat'l Shooting Sports Found.*, 716 F.3d at 214 (quoting *McDonnell Douglas Corp.*, 375 F.3d at 1187). Accordingly, the Board's determination that the factor of consumer care is neutral lacked substantial evidence.

### e. Balancing the Factors

While we agree with the Board's assessment of the respective marks themselves, substantial evidence does not support the PTO's refusal to register based on the '657 Registration, given the dissimilarities in the respective services and goods and the high degree of consumer care. Thus, the Board's affirmance of the PTO's refusal to register under 15 U.S.C. § 1052(d) cannot be sustained.

### CONCLUSION

For the foregoing reasons, we reverse the Board's refusal to register under 15 U.S.C. § 1052(d) and remand for further proceedings consistent with this opinion.

**REVERSED AND REMANDED**