This Opinion is a
Precedent of the TTAB

Mailed: March 18, 2016

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

Trademark Trial and Appeal Board

_____

*In re Mr. Recipe, LLC*

_____

Serial No. 86040643
Serial No. 86040656

_____

Anne Marie Bossart of Cadwalader, Wickersham & Taft, LLP,
    for Mr. Recipe, LLC

Sara N. Benjamin, Trademark Examining Attorney, Law Office 110,
    Chris A.F. Pedersen, Managing Attorney.

_____

Before Quinn, Kuhlke and Bergsman,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Mr. Recipe, LLC ("Applicant") seeks registration on the Principal Register of the

marks JAWS (in standard characters) and JAWS DEVOUR YOUR HUNGER (in

standard characters) for

> Entertainment, namely, streaming of audiovisual material
> via an Internet channel providing programming related to
> cooking, in International Class 38.[1]

---

[1] Application Serial No. 86040643 for the mark JAWS and Serial No. 86040656 for the mark
JAWS DEVOUR YOUR HUNGER were filed on August 16, 2013, based upon Applicant's

The Trademark Examining Attorney has refused registration of Applicant's marks under Section 2(d) of the Trademark Act of 1946, 15 U.S.C. § 1052(d), on the ground that Applicant's marks so resemble the registered mark JAWS (typed drawing format) for "video recordings in all formats all featuring motion pictures," in Class 9[2] as to be likely to cause confusion.

After the Trademark Examining Attorney made the refusals final, Applicant appealed to this Board. In the Board's April 8, 2015 Order, the appeals were consolidated. The records in the two applications are very similar; any difference in the submissions we discuss will be noted.

We affirm the refusals to register.

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ; *see also In re Majestic Distilling Co., Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the services. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d)

---

allegation of a *bona fide* intention to use the marks in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

[2] Registration No. 2276097, issued September 7, 1999; renewed.

Prior to November 2, 2003, "standard character" drawings were known as "typed" drawings. A typed mark is the legal equivalent of a standard character mark. TMEP § 807.03(i) (January 2015).

goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

**A. The fame of the mark in the cited registration.**

This *du Pont* factor requires us to consider the fame of the mark in the cited registration. Fame, if it exists, plays a dominant role in the likelihood of confusion analysis because famous marks enjoy a broad scope of protection or exclusivity of use. A famous mark has extensive public recognition and renown. *Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002); *Recot Inc. v. M.C. Becton,* 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000); *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame may be measured indirectly by the volume of sales of and advertising expenditures for the goods and services identified by the marks at issue, "the length of time those indicia of commercial awareness have been evident," widespread critical assessments, notice by independent sources of the products identified by the marks, and the general reputation of the products and services. *Bose Corp. v. QSC Audio Products Inc.,* 63 USPQ2d at 1305-06, 1309.

Because of the nature of the evidence required to establish the fame of a registered mark, the Board does not expect Trademark Examining Attorneys to submit evidence as to the fame of the cited mark in an *ex parte* proceeding, and they do not usually do so. *See In re Thomas*, 79 USPQ2d 1021, 1027 n.11 (TTAB 2006). Rather, in an *ex parte* appeal the "fame of the mark" factor is normally treated as neutral because the record

generally includes no evidence as to fame. *See id.*; *see also In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1204 (TTAB 2009) (noting that the absence of evidence as to the fame of the registered mark "is not particularly significant in the context of an ex parte proceeding").

However, here, the Trademark Examining Attorney did submit evidence demonstrating that Registrant's movie JAWS is so well-known movie that it set the standard for summer blockbusters. In the July 1, 2014 Office Actions, the Trademark Examining Attorney submitted the following evidence:

1. An excerpt from the TCM (Turner Classic Movie) website (tcm.com) discussing the movie JAWS.

> In some ways **Jaws** (1975) is responsible for changing the direction of filmmaking and film marketing in Hollywood. For better or worse, this film, which kept scores of people from taking a dip in the ocean during the summer of 1975, was also the first motion picture to break the $100,000,000 record in box office rentals, bypassing such previous champions as *The Sound of Music* (1965) and *Gone With the Wind* (1939). As a result, studios began to produce more big event entertainments like *Star Wars* (1977), *Grease* (1978), and *Superman* (1978) with aggressive ad campaigns designed to produce record-breaking opening weekends. So, if you want to know why Hollywood produces fewer movies like *Taxi Driver* (1976) and *Coming Home* (1978), you can blame **Jaws** which started a trend that has become the standard for success in the film industry.
>
> While **Jaws** might not qualify as art, Steven Spielberg's suspenseful adaptation of the Peter Benchley best seller is a superior commercial entertainment. …

2. The TV GUIDE review of the movie JAWS characterized the movie as a "mega-hit," and "phenomenally successful."

> Because the film tapped into a common fear and played on it so skillfully, it was a worldwide hit and entered international popular culture. JAWS has been endlessly parodied by comedians and filmmakers alike, and John Williams' effective score has now become a cliché.

3. The WhatCulture.com website posted an article in 2010 entitled "50 Reasons Why Jaws Might Just Be the Greatest Film of All Time." The author characterized JAWS as an "instant classic."

4. The website FilmCrave.com rated JAWS the 67th best movie of all time as "calculated by movie ratings and members' Top Movie List."

5. the IMDb website (IMDb.com) identified JAWS as the number 72 top grossing movie of all time in the United States through 2014.

As a result of the perceived iconic status of the JAWS movie, it has repeatedly been spoken of as one of the best movies of all time and a top grossing film. According to the **ENCYCLOPAEDIA BRITANNICA**

> Spielberg's next movie, Jaws (1975), established him as a leading director, and *it was one of the highest-grossing films ever*. It featured Roy Scheider as the police chief of a resort town who battles a man-eating white shark. Joining him are Richard Dreyfuss as a marine biologist and Robert Shaw as a shark hunter. The highly praised thriller received an Academy Award nomination for best picture, and its ominous soundtrack by John Williams won an Oscar. *The film all but created the genre of summer blockbuster*—big action-packed movie released to an audience grateful to be in an air-conditioned theatre—and it established many of the touchstones of Spielberg's work: an ordinary but sympathetic main character is enlightened through a confrontation with some extraordinary being or

force that gradually reveals itself as the narrative unfolds.[3]
(Emphasis added).

We recognize the potential admissibility issues inherent in such evidence.[4] However, the stories are probative of the perceptions of the authors and of the content received by the readers. Further, there are multiple stories in different publications repeating the same basic information regarding the renown of the movie. Moreover, Applicant has not, in briefing the appeal, suggested that any of evidence put in by the Trademark Examining Attorney suffers from errors in its content and acknowledged

---

[3] "Steven Spielberg." *Encyclopædia Britannica. Encyclopædia Britannica Online. Encyclopædia Britannica Inc.* (2015). The Board may take judicial notice of information from encyclopedias. *B.V.D. Licensing Corp. v. Body Action Design Inc.,* 846 F.2d 727, 6 USPQ2d 1719 (Fed. Cir. 1988) (encyclopedias may be consulted); *In re Petroglyph Games Inc.,* 91 USPQ2d 1332, 1338 (TTAB 2009); *Sprague Electric Co. v. Electrical Utilities Co.,* 209 USPQ 88 (TTAB 1980) (standard reference works).

[4] The Board notes that the Federal Circuit, our primary reviewing court, has sanctioned the use of Internet evidence in *ex parte* registration proceedings. *See, e.g.*, *In re Bayer AG*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) ("[i]nternet evidence is generally admissible and may be considered for purposes of evaluating a trademark") (citations omitted). This, of course, is a corollary to the more general rule that, in *ex parte* proceedings, "administrative agencies like the PTO are not bound by the rules of evidence that govern judicial proceedings." *In re Epstein*, 32 F.3d 1559, 1565 (Fed. Cir. 1994). In addition, USPTO examining attorneys have a limited ability to collect evidence. As acknowledged in *In re Budge Mfg., Inc.*, 857 F.2d 773, 8 USPQ2d 1259 (Fed. Cir. 1988):

> In *ex parte* prosecution, the burden is initially on the Patent and Trademark Office (PTO) to put forth sufficient evidence that the mark for which registration is sought meets the … criteria of unregistrability. Mindful that the PTO has limited facilities for acquiring evidence — it cannot, for example, be expected to conduct a survey of the marketplace or obtain consumer affidavits — we conclude that the evidence of record here is sufficient to establish a *prima facie* case of deceptiveness.

*Id.* at 1260-1261. *See also In re Pacer Technology,* 338 F.3d 1348, 67 USPQ2d 1629, 1632 (Fed. Cir. 2003) (Federal Circuit was "mindful of the reality that the PTO is agency of limited resources"); *In re Loew's Theatres, Inc.,* 769 F.2d 764, 226 USPQ 865, 868 (Fed. Cir. 1985) (the examining attorney "does not have means" to undertake the research, such as a marketing survey, necessary to prove that the public would actually make the goods/place association asserted).

that "that registrant's JAWS mark is well-known in the movie industry,' while contending that "the evidence demonstrates at best a 'niche' level of fame."[5]

Applicant's argument that we must consider current fame and that at most these references only show how popular the movie was forty years ago, runs counter to the record, which includes content from contemporary website pages and the listing in the 2015 **ENCYCLOPAEDIA BRITANNICA.** Combined, this evidence illustrates the continuing impression of this movie and the associated title JAWS that has been registered as a trademark for video recordings and is entitled to the presumptions under Section 7(b) of the Trademark Act.

While the evidence demonstrates that JAWS is a famous movie, the issue before the Board is whether the evidence supports a finding that JAWS is famous as a trademark for "video recordings in all formats all featuring motion pictures." The TCM (Turner Classic Movie) website (tcm.com) printout attached to the July 1, 2014 Office Actions advertises the sale of a series of JAWS movies, as well as subsequent editions of the original JAWS movies. Thus, JAWS is not just the title of a movie, it is the title of a series of works. That the renown and success of JAWS-inspired sequels and reissued versions of the original demonstrates that "JAWS" is famous as the source identifier for a series of "video recordings in all formats all featuring motion pictures."

---

[5] 4 TTABVUE 7.

Applicant argues, to the contrary, that "the evidence demonstrates at best a 'niche' level of fame insufficient to create a likelihood of confusion"[6] and that [t]he general public is unlikely to be confused as between applicant's mark[s] for streaming programming content relating to cooking, which will be produced going forward, and "registrant's 40-year-old-thriller about a shark."[7] As noted above, we have found that the mark JAWS is famous for "video recordings in all formats all featuring motion pictures." "Niche fame" is the renown of a mark in a specialized market (*e.g.,* a specific geographic area or field of endeavor). *See UMG Recordings Inc. v. Mattel Inc.,* 100 USPQ2d 1868, 1888 (TTAB 2011) ("Applicant's arguments that the fame of opposer's MOTOWN mark is limited to a niche market is not well taken, as opposer's fame is obviously not limited to a geographic region, a segment of an industry or service, or a particular channel of trade.") (citing *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164 1182 (TTAB 2001)); *see also ProQuest Information and Learning Co. v. Island,* 83 USPQ2d 1351, 1358 (TTAB 2007) (the Board characterized the renown of plaintiff's mark within the academic, research and education fields as niche market fame). It is relevant to counter a showing of fame in the dilution context, not in the context of likelihood of confusion. *See Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772,* 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005) ("While dilution fame is an either/or proposition—fame either does or does not exist— likelihood of confusion fame varies along a spectrum from very strong to very weak."

---

[6] 4 TTABVUE 7.

[7] 4 TTABVUE 8.

(internal quotation omitted)). And, in any event, the evidence shows that JAWS has permeated into general culture, including being parodied by filmmakers; and its fame is not limited to subject matter such that it would be confined to "a 'niche' level of fame."

However, merely because we have found JAWS to be famous as a trademark for video recordings featuring motion pictures does not end our inquiry; it is only one of the *du Pont* factors that we must consider. As the Board explained in *Blue Man Productions Inc. v. Tarmann,* 75 USPQ2d 1811, 1819 (TTAB 2005), *rev'd on other grounds,* No. 05-2037, 2008 WL 686402 (D.D.C. April 3, 2008), the fame of Registrant's mark alone is not enough to prove that there is a likelihood of confusion.

> If that were the case, having a famous mark would entitle the owner to a right in gross, and that is against the principles of trademark law. *See University of Notre Dame du Lac v. J. C. Gourmet Food Imports Co., Inc.*, 703 F.2d 1372, 217 USPQ 505, 507 (Fed. Cir. 1983):
>
> > The fame of the [plaintiff's] name is insufficient in itself to establish likelihood of confusion under § 2(d). "Likely* * * to cause confusion" means more than the likelihood that the public will recall a famous mark on seeing the same mark used by another. It must also be established that there is a reasonable basis for the public to attribute the particular product or service of another to the source of the goods or services associated with the famous mark. To hold otherwise would result in recognizing a right in gross, which is contrary to principles of trademark law and to concepts embodied in 15 USC § 1052(d).
>
> *See also Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000) ("fame alone cannot overwhelm the other du Pont factors as a matter of law").

**B. The number and nature of similar marks in use on similar goods.**

Applicant contends that "consumers have dealt with multiple 'JAW' marks for goods and services involving audio-visual material and have not had any difficulty discerning between them."[8] Applicant referenced Registration No. 3911509 for the mark JAW BRANDING for, *inter alia,* "audio and video recording services," initially cited as a bar to registration, but subsequently withdrawn. We find the argument unpersuasive. First, one registered mark (different from the one cited herein) is not sufficient to establish that the term "Jaws" is diluted for purposes of determining the strength of the registered mark. Second, absent evidence of actual use, one third-party registration has little probative value, especially in the absence of evidence that the mark is in use on a commercial scale or that the public has become familiar with it. *See Olde Tyme Foods Inc. v. Roundy's Inc.,* 961 F.2d 200, 22 USPQ2d 1542, 1545 (Fed. Cir. 1992) ("As to strength of a mark, however, registration evidence may not be given any weight."); *Smith Bros. Mfg. Co. v. Stone Mfg. Co.,* 476 F.2d 1004, 177 USPQ 462, 463 (CCPA 1973) (the purchasing public is not aware of registrations reposing in the U.S. Patent and Trademark Office); *Productos Lacteos Tocumbo S.A. de C.V. v. Paleteria La Michoacana Inc.*, 98 USPQ2d 1921, 1934 (TTAB 2011); *In re Hub Distributing, Inc.,* 218 USPQ 284, 285 (TTAB 1983) ("third party registrations in this Office, absent evidence of actual use of the marks [that are the] subject[s] of

---

[8] 4 TTABVUE 6.

the third-party registrations, … are entitled to little weight on the question of likelihood of confusion.").[9]

Applicant also referenced the five intent-to-use applications the Trademark Examining Attorney cited as potential bars to registration. There is no evidence of record that these applications ever registered and a pending application is evidence only that the application was filed on a certain date; it is not evidence of use of the mark. *Nike Inc. v. WNBA Enterprises LLC,* 85 USPQ2d 1187, 1193 n.8 (TTAB 2007); *Interpayment Services Ltd. v. Docters & Thiede,* 66 USPQ2d 1463, 1468 n.6 (TTAB 2003); *In re Juleigh Jeans Sportswear, Inc.,* 24 USPQ2d 1694, 1699 (TTAB 1992); *Olin Corp. v. Hydrotreat, Inc.,* 210 USPQ 62, 65 n.5 (TTAB 1981); *Merritt Foods Co. v. Americana Submarine,* 209 USPQ 591, 594 (TTAB 1980). Further, there is no evidence that there are any third parties using JAWS-formative marks.

We find that the lack of any evidence of significant third-party use of JAWS as applied to the goods and services at issue means that the broad scope of protection based on the fame of Registrant's JAWS mark for video recordings featuring motion pictures is not curtailed by this *du Pont* factor.

**C. The similarities or dissimilarities between the marks in their entireties, in terms of appearance, sound, connotation and commercial impression.**

---

[9] *Jack Wolfskin Ausrustung Fur Draussen GmbH & Co. KGAA v. New Millennium Sports, S.L.U.,* 797 F.3d 1363, 116 USPQ2d 1129, 1135-36 (Fed. Cir. 2015) and *Juice Generation, Inc. v. GS Enters. LLC*, 794 F.3d 1334, 115 USPQ2d 1671, 1674 (Fed. Cir. 2015) are not to the contrary. Those decisions highlighted that a "considerable" or extensive" number of third-party registrations may well have, in the aggregate, evidentiary value. Here, in stark contrast, we have one registration and no indication of the impact of its use on consumers.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E. I. du Pont De Nemours & Co.,* 177 USPQ at 567. In a particular case, "two marks may be found to be confusingly similar if there are sufficient similarities in terms of sound *or* visual appearance *or* connotation." *Kabushiki Kaisha Hattori Seiko v. Satellite Int'l, Ltd.,* 29 USPQ2d 1317, 1318 (TTAB 1991), *aff'd mem.,* 979 F.2d 216 (Fed. Cir. 1992) (citation omitted). *See also Eveready Battery Co. v. Green Planet Inc.,* 91 USPQ2d 1511, 1519 (TTAB 2009) (citing *Krim-Ko Corp. v. The Coca-Cola Co.,* 390 F.2d 728, 156 USPQ 523, 526 (CCPA 1968) ("It is sufficient if the similarity in either form, spelling or sound alone is likely to cause confusion.")).

"The proper test is not a side-by-side comparison of the marks, but instead 'whether the marks are sufficiently similar in terms of their commercial impression' such that persons who encounter the marks would be likely to assume a connection between the parties." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1721 (Fed. Cir. 2012); *see also San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd mem.,* 972 F.2d 1353 (Fed. Cir. 1992). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Geigy Chem. Corp. v. Atlas Chem. Indus., Inc.,* 438 F.2d 1005, 169 USPQ 39, 40 (CCPA 1971); *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1438 (TTAB 2012); *Winnebago*

*Industries, Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106, 108 (TTAB 1975). Since the goods and services at issue are video recordings featuring motion pictures and the "streaming of audiovisual material via an Internet channel providing programming related to cooking," the relevant customers will be ordinary consumers with an interest in cooking.

Applicant's mark JAWS is identical to the JAWS mark in the cited registration.[10] Applicant's mark JAWS DEVOUR YOUR HUNGER (the slogan mark) is similar to Registrant's mark because they share the word "Jaws." The word "Jaws" is the dominant element of Applicant's mark because it is the subject of the sentence or slogan JAWS DEVOUR YOUR HUNGER and because DEVOUR YOUR HUNGER conveys the impression of an explanatory slogan, and it is the first part of the mark. *See Palm Bay Imports*, 73 USPQ2d at 1692 ("Veuve" is the most prominent part of the mark VEUVE CLICQUOT because "veuve" is the first word in the mark and the first word to appear on the label); *Century 21 Real Estate Corp. v. Century Life of America,* 970 F.2d 874, 23 USPQ2d 1698, 1700 (Fed. Cir. 1992) (upon encountering the marks, consumers will first notice the identical lead word); *Presto Products Inc. v. Nice-Pak Products, Inc.,* 9 USPQ2d 1895, 1897 (TTAB 1988) ("it is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered").

---

[10] Applicant concedes that these marks are "similar." 4 TTABVUE 5 in Application Serial No. 86040643.

Further, as to Applicant's slogan mark, while the word "Jaws" is the most prominent part of Applicant's mark, we are cognizant that the analysis of the similarity or dissimilarity of the marks cannot be predicated on dissecting the marks into their various components; that is, the decision must be based on the entire marks, not just part of the marks. *See Stone Lion Capital Partners, LP v. Lion Capital LLP,* 746 F.3d 1317, 110 USPQ2d 1157, 1161 (Fed. Cir. 2014); *In re National Data Corp.,* 753 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985). *See also Franklin Mint Corp. v. Master Mfg. Co.,* 667 F.2d 1005, 212 USPQ 233, 234 (CCPA 1981) ("It is axiomatic that a mark should not be dissected and considered piecemeal; rather, it must be considered as a whole in determining likelihood of confusion."). On the other hand, there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on a consideration of the marks in their entireties. *In re National Data Corp.,* 224 USPQ at 751.

In this regard, because Applicant's mark JAWS DEVOUR YOUR HUNGER is in standard characters, its presentation is not limited to any particular depiction. The rights associated with a mark in standard characters reside in the wording and not in any particular display. *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1909-11 (Fed. Cir. 2012); *Squirtco v. Tomy Corp.,* 697 F.2d 1038, 216 USPQ 937, 939 (Fed. Cir. 1983); *In re RSI Systems, LLC,* 88 USPQ2d 1445, 1448 (TTAB 2008); *In re Pollio Dairy Products Corp.,* 8 USPQ2d 2012, 2015 (TTAB 1988). Thus, Applicant could display its mark emphasizing the word "Jaws" as shown below:

# *JAWS*
Devour Your Hunger

Finally, while there is no explicit rule that we find marks to be similar where Applicant's mark contains in part the whole of the mark in the cited registration, the fact that the cited registered mark is incorporated in full in Applicant's mark increases the similarity between the two because, in this case, the addition of the phrase "Devour Your Hunger" calls to mind the shark from the JAWS movies. *See, e.g., In re Toshiba Med. Sys. Corp.*, 91 USPQ2d 1266, 1271 (TTAB 2009) (applicant's mark VANTAGE TITAN for medical magnetic resonance imaging diagnostic apparatus confusingly similar to TITAN for medical ultrasound diagnostic apparatus); *In re El Torito Rests., Inc.*, 9 USPQ2d 2002, 2004 (TTAB 1988) (applicant's mark MACHO COMBOS for food items confusingly similar to MACHO for restaurant entrees); *In re U.S. Shoe Corp.,* 229 USPQ 707, 709 (TTAB 1985) (applicant's mark CAREER IMAGE for women's clothing stores and women's clothing likely to cause confusion with CREST CAREER IMAGES for uniforms including items of women's clothing); *In re Riddle*, 225 USPQ 630, 632 (TTAB 1985) (RICHARD PETTY'S ACCU TUNE for automotive service centers confusingly similar to ACCU-TUNE for automotive testing equipment).

Applicant contends that its mark JAWS DEVOUR YOUR HUNGER "evinces a clear connection between the mark and food which is lacking from registrant's 'JAWS' mark and which distinguishes Applicant's mark."[11] However, because of the fame of

---

[11] 4 TTABVUE 6 in Application Serial No. 86040656.

Registrant's JAWS mark, the shark's reputation as having a voracious appetite, and Applicant's standard character form application, Applicant's mark is just as likely to engender a commercial impression of Registrant's shark as of an appetite to be satisfied.[12]

Considering both of Applicant's marks in their entireties, we find that Applicant's mark JAWS is identical to the registered mark and Applicant's mark JAWS DEVOUR YOUR HUNGER is similar to the registered mark in terms of appearance, sound, connotation and commercial impression.

**D. The similarity or dissimilarity and nature of the goods and services.**

As noted above, Applicant is seeking to register its marks for "streaming of audiovisual material via an Internet channel providing programming related to cooking" and the mark in the cited registration is registered for "video recordings in all formats all featuring motion pictures."

It is well-settled that the goods and services of the parties need not be identical or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the respective goods and services of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the

---

[12] A shark is a species of marine fish "which are large, voracious, and sometimes dangerous to humans." **The American Heritage Dictionary of the English Language (Unabridged)**, p. 1759 (2d ed. 1987).

same source. *See Coach Servs.*, 668 F.3d 1356, 101 USPQ2d at 1722; *In re Accelerate s.a.l.*, 101 USPQ2d 2047, 2050 (TTAB 2012). The issue, of course, is not whether purchasers would confuse the goods and services, but rather whether there is a likelihood of confusion as to the source of the goods and services. *In re Binion*, 93 USPQ2d 1531, 1535 (TTAB 2009).

Applicant's recitation of services is restricted to "streaming of audiovisual material" delivered on an "Internet channel providing programming related to cooking." We treat this identification as limiting Applicant's streaming of audiovisual material to involving only cooking; however, Registrant's description of goods identifies motion pictures without any limitation to the subject matter, which means that Registrant's motion pictures may feature cooking in some form or manner. We do not read restrictions into the description of goods and services. *See Squirtco v. Tomy Corp.,* 697 F.2d 1038, 216 USPQ 937, (Fed. Cir. 1983) ("where the likelihood of confusion is asserted with a registered mark, the issue must be resolved on the basis of the goods named in the registration and, in the absence of specific limitations in the registration, on the basis of all normal and usual channels of trade and methods of distribution. There is no specific limitation here, and nothing in the inherent nature of SquirtCo's mark or goods that restricts the usage of SQUIRT for balloons to promotion of soft drinks. The board, thus, improperly read limitations into the registration.")(internal citation omitted).; *Paula Payne Products Co. v. Johnson Publishing Co.*, 473 F.2d 901, 177 USPQ 76, 77 (CCPA 1973) ("What is more significant than appellee's failure to limit the description of goods to a particular

channel of trade or market, is the absence of a limitation in appellant's registration which would exclude appellee's market. For purposes of this opposition proceeding, therefore, we give full sweep to appellant's registration description of goods and view the goods and modes of distribution as the same.") (internal citation omitted).

The Trademark Examining Attorney submitted 41 copies of third-party registrations for marks registered for video recordings and streaming video services. Third-party registrations which individually cover a number of different goods and services that are based on use in commerce may have some probative value to the extent that they serve to suggest that the listed goods and services are of a type which may emanate from the same source. *In re Albert Trostel & Sons Co.,* 29 USPQ2d 1783, 1785-1786 (TTAB 1993); *In re Mucky Duck Mustard Co. Inc.,* 6 USPQ2d 1467, 1470 n.6 (TTAB 1988). The registrations listed below are representative.[13]

| Mark | Reg. No. | Goods and Services |
|---|---|---|
| LAFFMOB | 4254201 | Audiovisual recordings, DVDs featuring comedy;<br><br>Streaming of audio visual content |
| | | |
| XPEEPS | 3651007 | Pre-recorded video cassettes, video discs, video recordings, DVDs featuring a wide variety of film subjects;<br><br>Video streaming services featuring independent films and movies |
| | | |
| STEREOFAME | 3851460 | Audiovisual recordings featuring music and entertainment; |

---

[13] We have not included the entire description of goods and services for each of the registrations. Only the relevant goods and services in both Applicant's application and Registrant's registration are listed.

| Mark | Reg. No. | Goods and Services |
|---|---|---|
| | | Streaming of video material |
| | | |
| MARINE LAYER PRODUCTIONS | 3998808 | DVDs, CDs, video discs, downloadable audio and visual recordings featuring surfing and sports;<br><br>Streaming videos and audio via the Internet |
| | | |
| STREAMATE | 3809908 | Downloadable adult-themed photographs and video;<br><br>Streaming of audio and video materials via the Internet |

Applicant argues that although it "concedes that it is not impossible for a motion picture to involve cooking, programming relating to cooking such as the application at issue here describes is generally understood to be separate and distinct from motion pictures, or movies."[14] However, Applicant did not submit any evidence to support its conclusion regarding the lack of relationship between the goods and services or any evidence to overcome the identifications which when given full scope could overlap. Moreover, it is just as likely that the consuming public generally understands that video recordings of movies may be converted to a format that may be streamed over the internet. To the extent that the manner in which content is provided (*i.e.*, streaming an Internet channel v. video recordings of a feature film) serve to obviate likely confusion, the fame of Registrant's mark is sufficient to broaden the scope of protection to encompass such differences.

---

[14] 4 TTABVUE 6.

Applicant likened the facts in this case to the facts in *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059 (Fed. Cir. 2003). The court, in *Coors*, reversed a Board determination that there was likelihood of confusion between the registered mark for BLUE MOON for restaurant services and for the applied-for mark BLUE MOON for beer. The court explained that the fact that "some restaurants sell private label beer" does not alone imply that consumers will assume that beer served in a restaurant has the same source of origin as the restaurant services. *Id.* at 1063.

> Coors introduced evidence that there are about 1,450 brewpubs, microbreweries, and regional specialty breweries in the United States, while there are approximately 815,000 restaurants. There was no contrary evidence introduced on those points. That means that even if all brewpubs, microbreweries, and regional specialty breweries featured restaurant services, those establishments would constitute only about 18 one-hundredths of one percent of all restaurants, or fewer than one in 500. While there was evidence that some restaurants sell private label beer, that evidence did not suggest that such restaurants are numerous. And although the Board had before it a few registrations for both restaurant services and beer, the very small number of such dual use registrations does nothing to counter Coors' showing that only a very small percentage of restaurants actually brew their own beer or sell house brands of beer; instead, the small number of such registrations suggests that it is quite uncommon for restaurants and beer to share the same trademark. Thus, the evidence before the Board indicates not that there is a substantial overlap between restaurant services and beer with respect to source, but rather that the degree of overlap between the sources of restaurant services and the sources of beer is *de minimis*.

*Id.* While "something more" was required to show relatedness in the circumstances of that case, the evidence submitted by the Trademark Examining Attorney not only failed to show that there was "something more," but it failed to rebut the evidence

submitted by the applicant. As noted above, in this case, unlike *Coors,* Applicant failed to introduce any evidence to rebut the Trademark Examining Attorney's evidence suggesting that the goods and services are of a type that may emanate from a single source.

We further note that the circumstances of this case do not require a showing of "something more." Rather, the types of goods and services in question are simply different conduits for presenting content, reflecting technological advances, i.e., from offering content through "hard copies" of DVDs or CDs to streaming content over the Internet, and, as such, are "generally recognized as having a common source of origin." *In re St. Helena Hospital*, 774 F.3d 747, 113 USPQ2d 1082, 1087 (Fed. Cir. 2014).

In view of the foregoing, we find that Applicant's "streaming of audiovisual material via an Internet channel providing programming related to cooking" is related to Registrant's "video recordings in all formats all featuring motion pictures."

### E. Balancing the factors.

On the one hand, "there is … no excuse for even approaching the well-known mark of a competitor." *Specialty Brands, Inc. v. Coffee Bean Distributors, Inc.,* 748 F.2d 669, 223 USPQ 1281, 1285 (Fed. Cir. 1984) (quoting *Planters Nut & Chocolate Co. v. Crown Nut Co., Inc.,* 305 F.2d 916, 134 USPQ 504, 511 (CCPA 1962)). On the other

hand, as noted above, because the registered mark is famous does not *ipso facto* mean that there is a likelihood of confusion.

In reaching our decision in this appeal, we are constrained, of course, by the inherent limitations of the nature of our administrative proceedings. *See* TBMP § 102 (June 2015) ("The Board is empowered to determine only the right to register."). One of those constraints is that we are bound by the description of goods and services in the cited registration and application despite what evidence may be presented regarding marketplace realities. In the present case, the description of goods in the cited registration is for motion pictures in all video recording formats without any restriction or limitation as to subject matter and because we do not read in limitations, the description of goods may include cooking in some form or fashion.

We have reviewed all of the evidence of record and conclude that because the mark in the cited registration is famous,[15] one of Applicant's marks is identical to the mark in the cited registration and the other mark is similar, and the goods and services are related, we find that Applicant's marks JAWS and JAWS DEVOUR YOUR HUNGER both for "entertainment, namely, streaming of audiovisual material via an Internet channel providing programming related to cooking" are likely to cause confusion with the registered mark JAWS for "video recordings in all formats all featuring motion pictures."

---

[15] Even if the registered mark were not famous, we would find that there is a likelihood of confusion based on the other *du Pont* factors.

While we acknowledge Applicant's arguments about the broad scope of protection being given to the cited registration, that scope of protection is dictated by Section 7(b) of the Trademark Act, 15 U.S.C. § 1057(b). We point out that applicants in these circumstances are not without possible remedies, including seeking a consent from the owner of the cited registration, or seeking a restriction of the registration in inter partes proceedings under Section 18 of the Trademark Act, 15 U.S.C. § 1068.

**Decision**: The refusals to register Applicant's marks JAWS and JAWS DEVOUR YOUR HUNGER are affirmed.