This Opinion is a
Precedent of the TTAB

Mailed: August 21, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

____

Trademark Trial and Appeal Board

____

*Ricardo Media Inc.*
*v.*
*Inventive Software, LLC*

____

Opposition No. 91235063

____

Aimee M. Allen and Julie B. Seyler of Abelman, Frayne & Schwab
   for Ricardo Media Inc.

Robert Ross for Inventive Software, LLC.

____

Before Taylor, Adlin and Larkin,
   Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

   Applicant Inventive Software, LLC seeks registration of RICHARD MAGAZINE,

in standard characters (MAGAZINE disclaimed), for:

> providing a website featuring an online marketplace for
> exchanging goods and services with other users; providing
> a website used to place on-line commercial orders in the
> field of fashion; providing a website used to place on-line
> commercial orders in the field of beauty, in International
> Class 35; and
>
> entertainment services, namely, providing a web site
> featuring photographic, audio, video and prose
> presentations featuring fashion; entertainment services,
> namely, providing a web site featuring photographic,
> audio, video and prose presentations featuring beauty;
> entertainment services, namely, providing a web site

> featuring photographic, audio, video and prose presentations featuring lifestyle, in International Class 41.[1]

In its notice of opposition, Opposer Ricardo Media Inc. alleges that use of Applicant's mark is likely to cause confusion as to the source of Applicant's services. Opposer specifically relies its registrations for the mark RICARDO in standard characters, one for "forks, knives and spoons" in International Class 8,[2] and the other for:

> publications, namely, magazines and books in the culinary field, in International Class 16;
>
> kitchen utensils and accessories, namely, household containers for food, cooking pots, saucepans, corkscrews, kettles, cake molds, dishes, carafes, potpourri dishes, glass beverageware, cooking strainers, cheese graters, knife blocks, salt shakers, pepper shakers, butter dishes and lunch boxes, in International Class 21;
>
> oven mitts, in International Class 24;
>
> aprons, in International Class 25; and
>
> production of television programs in the culinary field, in International Class 41.[3]

---

[1] Application Serial No. 87186504, originally filed September 28, 2016 under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on alleged first use dates of August 9, 2016 for both classes of services; Applicant later amended the filing basis for the Class 35 services to an alleged intent to use the mark in commerce under Section 1(b) of the Act, 15 U.S.C. § 1051(b).

[2] Registration No. 4906588, issued March 1, 2016 under Section 44(e) of the Act, 15 U.S.C. § 1126(e), based on Canadian Registration No. TMA909416.

[3] Registration No. 4915877, issued March 15, 2016 under Section 44(e) based on the same Canadian registration.

1 TTABVUE 5 (Notice of Opposition ¶¶ 3, 4, 14).[4] In its answer, Applicant denies the salient allegations in the notice of opposition.

## I. The Record and Evidentiary Objections

The record consists of the pleadings and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of Applicant's involved application. In addition, Opposer introduced:

> First Notice of Reliance ("Opp. NOR 1") on third-party registrations, Internet printouts and printed publications. 5 TTABVUE.

> Second Notice of Reliance ("Opp. NOR 2") on Internet printouts and printed publications. 6 TTABVUE.

> Third Notice of Reliance ("Opp. NOR 3") on Internet printouts. 7 TTABVUE.

> Fourth Notice of Reliance ("Opp. NOR 4") on its pleaded registrations. 8 TTABVUE.

> Fifth Notice of Reliance ("Opp. NOR 5") on its unpleaded application Serial No. 87850635, purportedly to establish that the parties' services are related. 9 TTABVUE.[5]

> Sixth Notice of Reliance ("Opp. NOR 6") on Applicant's responses to Opposer's Interrogatories. 10 TTABVUE.

---

[4] Citations to the record reference TTABVUE, the Board's online docketing system. The number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer(s) to the page number(s) of the docket entry where the cited materials appear.

[5] Because this application was not pleaded, we have not considered the "status and title copy" of the application which Opposer introduced at trial as a basis for the opposition. *Fujifilm SonoSite, Inc. v. Sonoscape Co., Ltd.*, 111 USPQ2d 1234, 1235-36 (TTAB 2014); *Wet Seal, Inc. v. FD Mgmt., Inc.*, 82 USPQ2d 1629, 1634 (TTAB 2007). Moreover, while an unpleaded registration may be considered, like third-party registrations, for whatever probative value it may have under the *du Pont* factors, *Fujifilm*, 111 USPQ2d at 1236, applications are of limited probative value. *Weider Pubs. LLC v. D&D Beauty Care Co.*, 109 USPQ2d 1347, 1360 (TTAB 2014) (evidence only that applications were filed). Even if considered, this application would not establish that the parties' services are related.

>Seventh Notice of Reliance ("Opp. NOR 7") on online dictionary definitions. 11 TTABVUE.
>
>Testimonial Declaration of Brigitte Coutu, its President, and the exhibits thereto ("Coutu Dec."). 12 TTABVUE.
>
>First Rebuttal Notice of Reliance ("Opp. Reb. NOR 1") on Internet printouts and a printed publication. 15 TTABVUE.
>
>Second Rebuttal Notice of Reliance ("Opp. Reb. NOR 2") on Internet printouts. 16 TTABVUE.

Applicant introduced a Notice of Reliance ("App. NOR") on Internet printouts. 13 TTABVUE.

Applicant makes a number of "objections" to Opposer's evidence. 18 TTABVUE 13-18. The objections are all overruled.

Applicant's argument that "[t]hird-party registrations and articles have no probative value as to whether the average American purchaser would be confused," 18 TTABVUE 14, is contrary to Board precedent. In fact, "[t]hird-party registrations which cover a number of differing goods and/or services, and which are based on use in commerce, although not evidence that the marks shown therein are in use on a commercial scale or that the public is familiar with them, may nevertheless have some probative value to the extent that they may serve to suggest that such goods or services are of a type which may emanate from a single source." *See In re Mucky Duck Mustard Co.*, 6 USPQ2d 1467, 1470 n.6 (TTAB 1998); *see also Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002) (evidence

that "a single company sells the goods and services of both parties, if presented, is relevant to a relatedness analysis").

As for articles, whether from the Internet or printed publications, Applicant is correct that because they are not accompanied by testimony, they may not be considered for the truth of the matters asserted therein. Nevertheless, they are admissible for what they show on their face. *Safer Inc. v. OMS Inv. Inc.*, 94 USPQ2d 1031, 1037 n.14 and 1040 (TTAB 2010). Moreover, sometimes what Internet printouts and printed publications show on their face is relevant to trademark cases, including likelihood of confusion cases. *Harry Winston, Inc. and Harry Winston S.A. v. Bruce Winston Corp.*, 111 USPQ2d 1419, 1428 (TTAB 2014) ("… such materials are frequently competent to show, on their face, matters of relevance to trademark claims (such as public perceptions), regardless of whether the statements are true or false. Accordingly, they will not be excluded outright, but considered for what they show on their face."). *See also In re Ayoub Inc.*, 118 USPQ2d 1392, 1399 n.62 (TTAB 2016); *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USQ2d 1458, 1467 n.30 (TTAB 2014).

Applicant's hearsay objection to the Spanish-English dictionaries is contrary to both Board and Federal Circuit precedent. We may and routinely do rely on dictionary definitions, including from online dictionaries. *In re Bayer Aktiengesellschaft*, 488 F.3d 960, 82 USPQ2d 1828, 1833 (Fed. Cir. 2007) ("Definitions available from an online resource that are readily available and as such capable of being verified are useful to determine consumer perception … The online dictionaries

and translations as well as the print dictionary evidence that Bayer submitted and the print dictionary cited by the Board provide substantial evidence that ASPIRINA means 'aspirin' and that both terms describe the same class of analgesic goods.").

The Coutu Declaration is admissible because the Trademark Rules were amended, effective January 14, 2017, to provide for testimony by declaration, even in the absence of a stipulation. Trademark Rule 2.123(a)(1); 81 Fed. Reg. 69,950 (Oct. 7, 2016) and 81 Fed. Reg. 89,382 (Dec. 12, 2016). Opposer's submission of the declaration under a notice of reliance was unnecessary, and not the preferred approach, but harmless. *See WeaponX Performance Prods. Ltd. v. Weapon X Motorsports, Inc.*, 126 USPQ2d 1034, 1037 (TTAB 2018) (submission of testimony declarations with a notice of reliance was of "no consequence" where the declarations were nonetheless served and the witnesses identified in pretrial disclosures). The declaration is not hearsay, as it contains Ms. Coutu's trial testimony (the equivalent of live testimony "in court").[6]

Opposer's rebuttal notices of reliance are admissible and not improper rebuttal. They rebut Applicant's evidence showing that Applicant's services "are substantially different from Opposer's offerings." 13 TTABVUE 4. Moreover, it is settled that evidence of third-party use of the same mark for an applicant's identified goods and

---

[6] Even before the amended Rules went into effect, when testimony could only be provided via testimonial deposition absent a stipulation to the contrary, the testimony was not taken "in court," or before the Board. TBMP § 702.03 ("… in lieu of live testimony, proceedings before the Board are conducted in writing, and the Board's actions in a particular case are based on the written record therein. The Board does not preside at the taking of testimony. Rather, all testimony is taken out of the presence of the Board, by affidavit or declaration, or on oral examination…."). Under the amended Rules, trial testimony is still not "in court" or taken "live" before the Board.

services (or similar goods or services) on the one hand, and an opposer's (or registrant's) identified goods and services (or similar goods and services) on the other, may establish a relationship between those goods and services. *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1051 (Fed. Cir. 2018); *see also In re C.H. Hanson Co.*, 116 USPQ2d 1351, 1355-56 (TTAB 2015); *In re Davia*, 110 USPQ2d 1810, 1815-17 (TTAB 2014); *In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1203 (TTAB 2009).

Suffice it to say, "we simply accord the evidence whatever probative value it deserves, if any at all … Ultimately, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence in this specific case, including any inherent limitations, and this precludes the need to strike the testimony and evidence." *Hunt Control Sys. Inc. v. Koninkijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011). *See also Grote Indus., Inc. v. Truck-Lite Co.,* 126 USPQ2d 1197, 1200 (TTAB 2018) ("We also remind the parties that our proceedings are tried before judges not likely to be easily confused or prejudiced. Objections to trial testimony on bases more relevant to jury trials are particularly unnecessary in this forum.") (citing *U.S. Playing Card Co. v. Harbro LLC*, 81 USPQ2d 1537, 1540 (TTAB 2006)); *RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1804 (TTAB 2018); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1478 (TTAB 2017) (quoting *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017)).

## II. The Parties

Opposer is a "culinary culture and lifestyle company" which "produces television shows and publishes a magazine and companion website covering food, recipes and other culinary and lifestyle topics." 12 TTABVUE 4 (Coutu Dec. ¶ 2). Ms. Coutu and her husband Ricardo Larrivée, "a world renowned celebrity chef based in Quebec, Canada," created Opposer, and in 2002 developed their RICARDO television cooking show and magazine. *Id.* (Coutu Dec. ¶ 3).

Opposer's use of RICARDO originated in and apparently focuses on Canada, but Opposer claims that the brand now has "global reach." *Id.* at 4-7 (Coutu Dec. ¶¶ 4, 14-15). While Opposer introduced precious little, if any, evidence of its use of RICARDO in the United States, Opposer's RICARDO magazine is "published through the digital app Texture," and 11,715 United States Texture subscribers "have identified Ricardo Magazine as their favorite." *Id.* at 5 (Coutu Dec. ¶ 5). Although "[c]ontent from the magazine is also published online at www.ricardocuisine.com," *id.*, Opposer did not introduce evidence that United States consumers are exposed to this content. *See In re Brouwerij Bosteels*, 96 USPQ2d 1414, 1424 (TTAB 2010) ("Insofar as applicant's website is concerned, although the alleged mark is displayed thereon, there is no information with respect to the number of visitors to the website. In the absence thereof, we are unable to determine whether a significant number of people in the United States have even viewed the alleged mark at the website.")

In addition to the forks, knives, spoons, cooking utensils, oven mitts, aprons and other goods and services listed in its registrations, Opposer also sells "home goods for dining and the kitchen" on its website, and "[t]he United States is the second largest

market for the online boutique, right after Canada." 12 TTABVUE 6 (Coutu Dec. ¶ 11). Opposer's sales "to the United States" since 2017 "exceed $10,000," *id.*, but Opposer has not provided any information about what specifically was sold to United States consumers or indicated whether those additional products or services even bear the RICARDO mark. In any event, at least a few of the products offered via Opposer's "online boutique" bear the RICARDO mark:



*Id.* at 19, 34 (Coutu Dec. Ex. C). Opposer "produces nearly all of its content in both English and French." *Id.* at 6 (Coutu Dec. ¶ 14).

The RICARDO brand focuses "on the importance of cooking and eating together with family and friends." *Id.* at 5 (Coutu Dec. ¶ 9). Nevertheless, according to Ms. Coutu, "the RICARDO magazine and online site also covers other lifestyle topics such as travel, wine, healthy eating, and gift ideas." *Id.* at 6 (Coutu Dec. ¶ 10).

While Applicant did not introduce any testimony, its interrogatory responses, which Opposer made of record, indicate that Applicant selected its mark "because it

9

is the name of Richard Wojtach, the owner and founder of [Applicant's] Magazine." 10 TTABVUE 15 (Applicant's Response to Opposer's Interrogatory No. 3(B)). Applicant introduced Internet printouts showing that it operates a website/magazine at "richardmagazine.com." 13 TTABVUE 5-121.[7] Applicant introduced a number of articles from the website, concerning the following topics: a New York City museum; a brand of tote bags made from recycled materials; an interview with a fashion illustrator; nail polish; a new bridal collection by Randy Fenoli of the television show "Say Yes to the Dress;" a bridal runway show at Bridal Fashion Week; a new makeup line by Karl Lagerfeld and ModelCo; a collaboration between Puma and MAC Cosmetics resulting in Puma Suede sneakers in three of the most popular MAC lipstick shades; the PromGirl Superstore; Dior's Fall 2018 Collection Lookbook; a collaboration between Missoni and Funboy to create a "designer pool float;" the Mango Dragonfruit Starbucks Refresher, and its suitability for Instagramming; Ouai pet shampoo; the latest Gucci Home décor and furniture offerings; expansion of the Too Faced Born This Way foundation line; Paris Hilton's skincare line ProD.N.A.; the relaunch of the Awake Skincare brand by Tarte Cosmetics and KOSÉ; Virgil Abloh's Off-White Resort 2019 Collection; the Selena Gomez Coach Fall 2018 campaign; and the Prada Fall/Winter 2018 Collection campaign. Applicant also introduced several pages from its website displaying skincare, jewelry, eyewear and wall art products, and their prices. *Id.* at 114-117.

---

[7] Opposer concedes that Applicant operates the website. 17 TTABVUE 6-7, 17-18.

### III. Standing

Opposer's pleaded registrations, electronic copies of which showing their current status and title were made of record with Opposer's notice of opposition and Opp. NOR 4, establish its standing. 1 TTABVUE 7-11; 8 TTABVUE 4-16. *See Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000).

### IV. Priority

Because Applicant has not counterclaimed to cancel either of Opposer's pleaded registrations, priority is not at issue with respect to the mark and goods and services identified therein. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

### V. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative evidence of record bearing on the likelihood of confusion. *In re E.I. Du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods and services. *See In re Chatam Int'l Inc.*, 380 F.3d 1340, 71 USPQ2d 1944, 1945 (Fed. Cir. 2004) (referring to these as "two key considerations"); *Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of

differences in the essential characteristics of the goods and differences in the marks."). Opposer bears the burden of establishing that there is a likelihood of confusion by a preponderance of the evidence. *Cunningham*, 55 USPQ2d at 1848. We consider the likelihood of confusion factors about which there is evidence. *Du Pont*, 177 USPQ at 567-68. *See also Zheng Cai v. Diamond Hong, Inc.*, 901 F.3d 1367, 127 USPQ2d 1797, 1800 (Fed. Cir. 2018) ("Not all of the *Du Pont* factors are relevant to every case, and only factors of significance to the particular mark need be considered."(quoting *In re Mighty Leaf Tea*, 601 F.3d 1342, 1346, 94 USPQ2d 1257, 1259 (Fed. Cir. 2010)).

## A. Similarity of the Marks

We must consider the marks "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *du Pont*, 177 USPQ at 567). The test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods and services offered under the respective marks is likely to result. *San Fernando Elec. Mfg. Co. v. JFD Elec. Components Corp.*, 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Rests. Inc. v. Morrison Inc.*, 23 USPQ2d 1735, 1741 (TTAB 1991). The focus is on the recollection of the average purchaser, who normally retains a general rather than a specific impression of trademarks. *See Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106, 108 (TTAB 1975); *see also In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1085 (Fed. Cir. 2014)

12

("marks must be considered in light of the fallibility of memory") (citation, internal quotation marks, and ellipsis omitted). Because the parties' goods and services relate to fashion, beauty, lifestyle and cooking, the "average purchaser" is an ordinary consumer.

Here, the marks have similarities and differences. We find that when the marks are considered in their entireties, the differences significantly outweigh the similarities.

### 1. Appearance

The marks have a somewhat similar appearance to the extent that the terms RICHARD in Applicant's mark and RICARDO in Opposer's differ by only two letters. Moreover, the term RICHARD in Applicant's mark is entitled to greater weight than the second term MAGAZINE, both because RICHARD comes first and because MAGAZINE is merely descriptive or generic, and has been disclaimed. *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018) ("The identity of the marks' initial two words is particularly significant because consumers typically notice those words first."); *Cunningham*, 55 USPQ2d at 1846 ("Regarding descriptive terms, this court has noted that the 'descriptive component of a mark may be given little weight in reaching a conclusion on the likelihood of confusion.'") (quoting *In re Nat'l Data Corp.*, 753 F.2d 1056, 224 USPQ 749, 752 (Fed. Cir. 1985)).

Despite this similarity, we find that the marks look different. Applicant's mark consists of two terms while Opposer's consists of just one, and while MAGAZINE is entitled to less weight in our analysis, we may not ignore it, even though it is disclaimed. *Shen Mfg. v. Ritz Hotel, Ltd.*, 393 F.3d 1238, 73 USPQ2d 1350, 1355 (Fed.

Cir. 2004) ("The disclaimed elements of a mark, however, are relevant to the assessment of similarity … This is so because confusion is evaluated from the perspective of the purchasing public, which is not aware that certain words or phrases have been disclaimed."); *Schwarzkopf v. John H. Breck, Inc.*, 340 F.2d 978, 144 USPQ 433 (CCPA 1965). Moreover, Applicant's mark appears to be a foreign language name, while RICHARD is a common English language name. When we consider the appearance of the marks in their entireties, the combination of the different names and the additional word in Applicant's mark makes them more dissimilar than similar in appearance.

### 2. Sound

There is no doubt that the marks sound different. In fact, RICHARD is a very common two-syllable name in the United States which has a consistent pronunciation. As for RICARDO, "it does not follow that any and all suggested pronunciations of a trademark must be deemed to be 'correct' or viable, even those which are inherently implausible and inconsistent with common phonetic usage and practice." *In re Who? Vision Sys. Inc.*, 57 USPQ2d 1211, 1218 (TTAB 2000). Rather, even though RICHARD and RICARDO have the same number of letters and share many of them, RICHARD features a soft "i," while the "i" in RICARDO would likely be pronounced as a long "e," by at least some Spanish speakers; the "ch" sound in RICHARD is much different than the hard "c" sound in RICARDO; and the "o" in RICARDO is absent from RICHARD. Moreover, for the reasons discussed below, the "c" rather than "ch" in RICARDO, and the "o" at the end of the name would likely signal to many American consumers that RICARDO is a name that originated in

Spanish, while RICHARD is known to be a common English language name. It would be "inherently implausible" for RICARDO to be pronounced similarly to RICHARD. In fact, RICHARD and RICARDO are different male given names, 11 TTABVUE 5, 7, and dictionary definitions of which we take judicial notice reveal that they have different pronunciations.[8]

### 3. Connotation (and whether the doctrine of foreign equivalents applies)

The parties argue mainly about the marks' connotations, and specifically about whether the doctrine of foreign equivalents applies to this case. When it applies, the doctrine of foreign equivalents treats differently-spelled words as having the same meaning where the foreign word, when translated into English, means the same as the English word. But, as we explain below, the doctrine of foreign equivalents should generally not apply to first names such as RICHARD and RICARDO that are widely-recognizable to American consumers, unless there is evidence that consumers would "translate" the names. Here, there is no such evidence.

Opposer has established, and Applicant does not dispute, that RICARDO is a name in the Spanish language which is the Spanish equivalent of the first name RICHARD in English. The dictionary entries provided appear to also at least strongly

---

[8] *See* https://www.dictionary.com/browse/richard (based on Random House Unabridged Dictionary (2019) and https://www.dictionary.com/browse/ricardo (based on Random House Unabridged.) The Board may take judicial notice of dictionary definitions, including online dictionaries that exist in printed format or have regular fixed editions. *In re Cordua Rests. LP*, 110 USPQ2d 1227, 1229 n.4 (TTAB 2014), *aff'd*, 823 F.3d 594, 118 USPQ2d 1632 (Fed. Cir. 2016); *Threshold TV Inc. v. Metronome Enters. Inc.*, 96 USPQ2d 1031, 1038 n.14 (TTAB 2010).

suggest that RICHARD is the English equivalent of the Spanish name RICARDO. 11 TTABVUE 5, 7.

> Under the doctrine of foreign equivalents, foreign words from common languages are translated into English to determine similarity of connotation with English word marks. *See Palm Bay Import*[s]*, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005). The doctrine is applied when it is likely that "the ordinary American purchaser would 'stop and translate [the term] into its English equivalent." *Palm Bay,* supra at 1696, quoting *In re Pan Tex Hotel Corp.*, 190 USPQ 109, 110 (TTAB 1976.).

*In re Thomas*, 79 USPQ2d 1021, 1024 (TTAB 2006). *See also In re Aquamar, Inc.*, 115 USPQ2d 1122 (TTAB 2015).

We have consistently found that Spanish is a "common language" in the United States, and we have routinely applied the doctrine of foreign equivalents to Spanish-language marks. *In re Aquamar,* 115 USPQ2d at 1127; *In re La Peregrina Ltd.*, 86 USPQ2d 1645, 1648 (TTAB 2008) ("there is no question that Spanish is a common, modern language"); *In re Perez*, 21 USPQ2d 1075 (TTAB 1991); *In re Am. Safety Razor Co.*, 2 USPQ2d 1459 (TTAB 1987); *In re Hub Distrib., Inc.*, 218 USPQ 284 (TTAB 1983); *Rosenblum v. George Willsher & Co.*, 161 USPQ 492 (TTAB 1969). Here, as in *Aquamar*, we also take judicial notice of the August 2013 United States Census Bureau's "Language Use in the United States: 2011" report, which indicates that

after English, Spanish is the most commonly spoken language in the United States, and that over 12% of the United States population speaks Spanish.[9]

The parties' doctrine of foreign equivalents dispute centers around whether ordinary American purchasers would "stop and translate" Opposer's mark. We agree with Applicant that they would not.

As the dictionary definitions make clear, "Richard" and "Ricardo" are each recognized personal names. They will thus be perceived as identifying particular individuals, whether known or unknown, real or fictional. Even if we assume that some people may go by the English version of their names in some contexts and by the Spanish (or other language) version of their names in other contexts, we find it unlikely that users of personal name trademarks would do so, or that consumers would "stop and translate" a common personal name used as mark, such as RICARDO. Opposer's use of RICARDO (as opposed to, for example, RICHARD) has been consistent. There is no evidence that Mr. Larrivée goes by any French (or English) translation of his name "Ricardo" in his business or personal dealings, even though Mr. Larrivée is bilingual, lives in a bilingual province in Canada and conducts business in both English and French. There is also no evidence that owners of any personal name trademarks use translations of their personal names, or that consumers translate personal name trademarks.

---

[9] http://www.census.gov/library/publications/2013/acs-22.html. The Board may take judicial notice of census data. *Blackhorse v. Pro-Football, Inc.*, 111 USPQ2d 1080, 1098 n.114 (TTAB 2014), *aff'd*, 112 F.Supp. 3d 439, 115 USPQ2d 1524 (E.D. Va. 2015), vacated on other grounds and remanded, *Pro Football, Inc. v. Blackhorse*, 709 F. App'x 183 (per curiam) (4th Cir. 2018) (mem.).

In finding that consumers would not typically "stop and translate" personal name trademarks, we have kept in mind that the very purpose of trademarks is to "identify and distinguish" goods or services from those of others, and to "indicate the source" of the goods or services. 15 U.S.C. § 1127. Inconsistent use of a personal name trademark, including by using it in more than one language, such that its spelling or pronunciation changes, could risk, and perhaps make inevitable, consumer confusion as to the true source of a product or service. *Cf.* 1 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 7:38.50 (5th ed. 2019) ("Only uniform and consistent appearance will allow uses of the mark to continue to imprint the image of the mark in the public mind as an easily and quickly recognized symbol. This is the primary reason why many companies impress upon employees, advertisers and retailers the importance of showing their marks only in a uniform format and style as reflected in a trademark usage manual. Uniformity of usage means easy and instant recognizability.").

While we often find that consumers would "stop and translate" marks consisting of words other than names, doing so would not necessarily result in an inconsistent or non-uniform mark, because words convey particular meanings, regardless of language. By contrast, personal names often convey more than one "meaning," because typically, as in this case, more than one person shares the personal name. We therefore find that generally consumers would be unlikely to "stop and translate" personal name marks, because doing so would point to not only a different person or people (whether real or fictional), but also to a different source, and to the mark losing

18

any "instant recognizability." In this specific case, the record does not support a finding that consumers would be likely to translate RICARDO to RICHARD, or RICHARD to RICARDO, but would instead take each name as it is, in its own language, as identifying the person named, whether real or fictional, known or anonymous.[10] We agree – at least under the circumstances presented here, which involve a Spanish first name that is widely-recognizable to American consumers – with the observation of the district court in *Habeeba's Dance of the Arts, Ltd. v. Knoblauch*, 430 F.Supp.2d 709, 80 USPQ2d 1311, 1316 (S.D. Ohio 2006): "If, as a factual matter, Plaintiff's business name is based on the first name of the founder, then there exists the legal issue of whether the doctrine of foreign equivalents would even apply."

One final point. As for Applicant, its content is apparently all in English, and there is no indication that Applicant's services have any relationship whatsoever to the Spanish language. There is no reason to think that American consumers, even Spanish speakers, would translate RICHARD to RICARDO. *Cf. In re Aquamar*, 115 USPQ2d at 1127 and *Am. Safety Razor Co.*, 2 USPQ2d 1459 (TTAB 1987) (in both of which translation of the marks was found likely because the record revealed the marks were directed to Spanish speakers, using Spanish language terms). While a connection between the language of the mark at issue and the goods and services is not required under the doctrine of foreign equivalents, the lack of any such connection

---

[10] Consumers who know that Opposer offers content in French and English, or who are aware that its trade name is "Ricardo Media Inc." may be especially unlikely to stop and translate from Spanish to English.

here is helpful in making the determination as to whether consumers would stop and translate a mark.

Looking at the issue of similarity of meaning more holistically, from the standpoint of overall commercial impression, Applicant's mark RICHARD MAGAZINE as a whole expressly identifies a particular magazine. Opposer's mark by itself conveys nothing about the goods or services offered thereunder. Rather, the use of a personal name as the entirety of a trademark sometimes conveys some type of celebrity (e.g., CHER, OPRAH, etc.) with commercial endeavors, as Opposer's evidence makes clear, and in the culinary field in question, it might identify a well-known chef (e.g., EMERIL). Opposer's proposition that consumers would translate these types of personal name marks is not supported by any evidence. Because by their nature such marks point to one particular person, and highlight his or her identity, translating these types of marks, with the result typically being a different name (e.g. RICHARD to RICARDO or vice versa), would be inconsistent with the signals these types of marks send.

To summarize our determination on the potential application of the doctrine of foreign equivalents, we find that in this case – involving, as it does, two first names that will be recognizable as such to ordinary American consumers – "it is unlikely that an American buyer will translate the foreign mark," but instead "will take it as it is." *Palm Bay*, 73 USPQ2d at 1696. Our observation in *In re Tia Maria, Inc.*, 188 USPQ 524 (TTAB 1975) seems to apply here:

> But, equally significant are the differences between the marks "TIA MARIA" and "AUNT MARY'S". It is recognized

that "AUNT MARY" is the English equivalent of "TIA MARIA", and that there are decisions which hold that no distinction for trademark purposes can be drawn between a foreign word and its English equivalent. But, nevertheless there are foreign expressions that even those familiar with the language will not translate, accepting the term as it is, and situations arise in the marketplace which make it unfeasible or even unlikely that purchasers will translate the brand names or labels appearing on canned foods and other like products. *cf. Le Cordon Bleu, S.A.R.L. v. Continental Nut Company*, 177 USPQ 734 (TT&A Bd., 1973), affirmed 181 USPQ 646 (CCPA, 1974). That is, insofar as this reasoning applies to the instant case, it is unlikely to expect that a person encountering "AUNT MARY'S" canned fruits and vegetables in a supermarket or other establishment where goods of this type are customarily sold would translate "AUNT MARY'S" into "TIA MARIA", and then go one step further and associate these food products with applicant's restaurant. Likewise, going the other route, it is difficult to perceive that a person who had purchased "AUNT MARY'S" canned fruits and vegetables on the shelves of a supermarket would, upon dining at the "TIA MARIA" restaurant in Mexican decor and surrounded by a menu of Mexican delicacies, translate "TIA MARIA" into "AUNT MARY" and then mistakenly assume that the "TIA MARIA" restaurant and "AUNT MARY'S" canned fruits and vegetables originate from or are sponsored by the same entity. This stretches a person's credulity much too far.

*Id.* at 525-26. The principle that there are "foreign expressions that even those familiar with the language will not translate, accepting the term as it is," *id.*, applies with equal if not greater force to personal names.

### 4. Summary: the marks are dissimilar

In sum, the marks are dissimilar when assessed in their entireties. They identify different people, with RICARDO identifying Ricardo Larrivée to those familiar with Opposer, or someone named RICARDO to those unfamiliar with Opposer, and RICHARD MAGAZINE identifying Mr. Wojtach, or someone named RICHARD to

those unfamiliar with Applicant. The term MAGAZINE is another difference affecting how the marks look and sound, while RICARDO appears to identify a specific, perhaps well-known person (most likely, given Opposer's identified goods and services, a chef or restaurateur). Absent evidence to the contrary, we find that consumers would be unlikely to "stop and translate" RICARDO into RICHARD (or RICHARD into RICARDO), as doing so would point them to a different source. This factor weighs heavily against finding a likelihood of confusion.

### B. The Goods and Services and Their Channels of Trade and Classes of Consumers

In comparing the goods and services, we focus on Opposer's magazines, books and television programs, which are much closer to Applicant's services (which include a "web site featuring photographic, audio, video and prose presentations") than Opposer's kitchen and cooking supplies.[11] Opposer's magazines, books and television programs have an inherent relationship to Applicant's services in a general sense, but Opposer's goods and services are specifically different than Applicant's.

That is, as the articles and other evidence from Applicant's website make clear, there is little practical difference between Opposer's books and magazines provided in "hard" format, and Applicant's website which features "photographic" and "prose" content, because photographic and prose content is often featured in books and magazines. Similarly, there is little practical difference between Opposer's television

---

[11] To the extent Opposer relies on alleged common law rights in RICARDO for online marketplace services, these rights are unpleaded, and the issue was not tried by implied consent. In any event, Opposer has not established prior United States use for these services. Therefore, we have not considered them, and we address only those goods and services in Opposer's pleaded registrations.

programs and Applicant's website featuring "audio" and "video" content, because television programs typically feature audio and video content. Moreover, the distinctions between "print" and "television programs" on the one hand and web content on the other continue to blur, such that consumers may not assume that content on paper or on television comes from a different source than content provided online.

Nevertheless, even though print, television and web content may share certain characteristics generally, they are not necessarily "related" in the trademark sense, especially in this case, where the subjects of the parties' content are specifically different. Indeed, Opposer's books, magazines and television programs are specifically limited to the "culinary field," while Applicant's website content is specifically limited to "fashion," "beauty" and "lifestyle." Thus, while the parties deliver their content in related ways, their content appears to be materially different.[12]

Opposer points out, however, that a "bizfluent.com" article indicates that "Lifestyle magazines often include articles and editorials in the areas of fashion, travel, food, trends, and general pop culture." 6 TTABVUE 6. In addition, Opposer introduced evidence from MARTHA STEWART LIVING magazine, which includes

---

[12] Opposer's argument that it is a "lifestyle" brand, and that its goods and services are thus related to Applicant's "lifestyle"-related content, is unsupported. In fact, Opposer has not established prior use of its mark in the United States for "lifestyle" content, goods or services. Its registrations are limited to "culinary" goods and services.

articles about "beauty" and "lifestyle" on the one hand and "culinary" topics on the other:



5 TTABVUE 64; *see also id.* at 58-61 (printouts from "marthastewart.com" showing use in connection with lifestyle and culinary topics) and 16 TTABVUE 63-79 (printouts from "marthastewart.com").[13] Opposer also introduced the following additional examples:

> CONDÉ NAST TRAVELER magazine includes articles about travel destinations, as well as personal grooming while travelling and food and beverages offered in various destinations. 5 TTABVUE 11-26; 6 TTABVUE 10.

---

[13] We do not find the evidence from ELLE DÉCOR magazine probative, as articles about decor do not fall within the "culinary field." 15 TTABVUE 2-67. Similarly, the FOOD & WINE magazine excerpts are all related to the "culinary field," but evidence that the mark is used in connection with "lifestyle" topics is absent. *Id.* at 105-108.

GOOP, which a New York Times Magazine article dubbed "the most controversial brand in the wellness industry," and bills itself as "a modern lifestyle brand," is used in connection with furniture, clothing and personal care products, and its website includes articles such as "The Plant-Based Ketogenic Diet" and "The 4 Best Vegetable Sides for a BBQ." 15 TTABVUE 109-131; 16 TTABVUE 32-47.

VOGUE magazine includes articles entitled "Can We Eat Meat Ethically? Ask Butcher-Memoirist Carmas Davis," "Cindy Sherman's New Pool Float Will Add Wonderful Weirdness to Any Summer Party," "Where Nanushka's Designer Finds the Best Ceramics and Home Décor in Budapest" and "An Oprah-Endorsed Interior Designer Explains Why Repainting a Room is Easier Than You Think." 15 TTABVUE 94, 95, 98, 101.

The RACHEL RAY SHOW website includes recipes on the one hand and articles about makeovers, summer parties and "household hacks" on the other. 16 TTABVUE 89-129.

GIADA DE LAURENTIIS's website offers for sale the "Giada's Italy" cookbook, and includes a "Makeup Checklist," and articles entitled "The Most Thoughtful Gifts for Everyone on Your List," "Get Giada's Metallic Chrome Nails at Home," "Spring Clean Your Beauty Routine" and "Giada's Italian Family Beauty Secrets." *Id.* at 137-153.

Opposer also introduced a third-party registration showing that MARTHA STEWART.COM is registered for cooking-related information and retail services on the one hand and homemaking, home care, decorating, gardening and entertaining information and retail services on the other (Reg. No. 2353116). 5 TTABVUE 44-45; *see also* 5 TTABVUE 34. As discussed in Section I, third-party registrations have some probative value on the issue of relatedness. *See, e.g.*, *In re Mucky Duck Mustard*, 6 USPQ2d at 1470 n.6.

Thus, the record establishes that some media sources offer both culinary content and "lifestyle" content, and is sufficient to persuade us that there is a relationship between Applicant's "lifestyle"-focused website and Opposer's culinary goods and services.[14] But we find that the evidence does not establish that the parties' goods and services, as set forth in the application and registration, are closely related.[15] In short, Opposer has established that there is a relationship between the goods and services, but the relationship has not been shown to be a strong one, and this factor therefore weighs only slightly in favor of finding a likelihood of confusion.[16]

Similarly, the evidence establishes that the channels of trade and classes of consumers for "fashion," "beauty" and "lifestyle" programming, content and services overlap to some degree with the channels of trade for and consumers of "culinary field" programming, content and services. At the same time, however, the parties' identifications of services contain specific limitations to particular and different

---

[14] The article in Applicant's magazine about "Instagramming" Starbucks's Mango Dragonfruit Refreshers is about a third-party's beverage, and focuses on the beverage's appearance and on social media. It is not an article related to the "culinary field." The question we are faced with here is whether consumers "would consider the goods to emanate from the same source." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1723 (Fed. Cir. 2012); *7-Eleven, Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007).

[15] Nor does the evidence convince us, as to Opposer's alleged common law use (which, as noted earlier, we are not considering), that RICARDO is a "lifestyle" brand known to U.S. consumers.

[16] Applicant's focus on the international classes in which the parties' goods and services reside is misplaced. The classes are irrelevant. *Jean Patou Inc. v. Theon Inc.*, 9 F.3d 971, 29 USPQ2d 1771, 1774 (Fed. Cir. 1993) (stating that classification is for the convenience of the Office and "wholly irrelevant to the issue of registrability under section 1052(d), which makes no reference to classification").

fields, and Opposer's evidence of overlapping channels of trade in these fields is limited to a handful of Internet printouts and printed publications submitted without supporting testimony or other explanation.[17] This factor also weighs in favor of finding a likelihood of confusion, but only slightly.

## VI. Conclusion

Here, the parties' marks are different in their entireties. While there is some relationship between the parties' services, channels of trade and classes of consumers, we find that the dissimilarity between the marks outweighs these factors. *Cf. Kellogg Co. v. Pack'em Enters. Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispositive.").

**Decision:** The opposition is dismissed.

---

[17] The mere fact that some consumers of Opposer's services might at some point also purchase Applicant's, or vice versa, is not a basis upon which to find that the goods and services, channels of trade or classes of consumers are related. All consumers buy shoes and toilet paper, but that does not mean they are related goods. *See generally Coach Servs.*, 101 USPQ2d at 1723; *Sports Auth. Mich. Inc. v. PC Auth. Inc.*, 63 USPQ2d 1782, 1794 (TTAB 2002) ("We think it a fit subject for judicial notice that purchasers of computer hardware and software also would be purchasers of, at least, footwear and apparel, and perhaps sporting goods and equipment. There is nothing in the record, however, to suggest that merely because the same consumer may purchase these items, such consumer would consider the goods as likely to emanate from the same source or have the same sponsorship.").