THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed: July 17, 2024

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re Samsung Display Co., Ltd.*

————

Serial No. 90502617

————

David A. Plumley and Karen Y. Kim of Lewis Roca Rothgerber Christie LLP,
    for Samsung Display Co., Ltd.

Katrina Yang, Trademark Examining Attorney, Law Office 127,
    Mark Pilaro, Managing Attorney.

————

Before Lykos, Coggins, and Cohen,
    Administrative Trademark Judges.

Opinion by Coggins, Administrative Trademark Judge:

Samsung Display Co., Ltd. ("Applicant") seeks registration on the Principal

Register of the mark UPC in standard characters for goods ultimately identified as

> Electric luminescent display panels, Light emitting diode
> (LED) displays, OLED (organic light emitting diode)
> display panels, flat panel display screens, and LCD large-
> screen displays, all as components of computer monitors,
> digital signage, digital signage display panels, video
> monitors, television monitors, televisions, smartphones,
> wearable video display monitors, video screens, and
> cameras; Electronic display screens as a component of
> digital cameras; Electronic display screens sold as an
> integral component of smart phones; Display panels as a

component of televisions in the nature of Liquid crystal display (LCD) televisions and flat panel display screens; Flexible flat panel displays as a component of computers; Video display screens as a component of portable communications apparatus, namely, smartphones, tablet computers and smart watches, in International Class 9.[1]

The Trademark Examining Attorney refused registration under Section 2(d) of the Trademark Act, 15 U.S.C. § 1052(d), on the ground that Applicant's mark, as applied to the goods identified in the application, so resembles the identical mark UPC, also in standard characters, for

Cable connectors and cable connector assemblies; electric cable assemblies; cable assemblies, namely, charging cables; electrical and electronic connectors; circular cable connectors; power connectors; coaxial cable connectors; automotive cable connectors; cable connectors for hybrid electric vehicles; cable connectors and cable connector assemblies for electric vehicles; electrical and electronic connectors for electric vehicles; cable connectors for electric vehicles, in International Class 9,[2]

on the Principal Register as to be likely to cause confusion, to cause mistake, or to deceive.

When the refusal was made final, Applicant filed a request for reconsideration, a voluntary amendment to the identification of goods, and appealed. The Examining

---

[1] Application Serial No. 90502617 was filed on February 1, 2021, under Sections 1(b) and 44(d) of the Trademark Act, 15 U.S.C. §§ 1051(b) and 1126(d), based upon Applicant's allegation of a bona fide intention to use the mark in commerce, and on South Korean Application No. 40-2020-0009679 filed on January 15, 2021. During prosecution, Applicant deleted the § 1(b) filing basis and perfected a § 44(e) basis by making of record United Kingdom Registration No. UK00003587983, which issued on June 4, 2021. *See* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1003.06 (May 2024) (an applicant may claim priority under § 44(d) based on a foreign application and proceed to registration under § 44(e) based on a different foreign registration).

[2] Registration No. 6404241, issued June 29, 2021.

Attorney issued a non-final Office action maintaining the Section 2(d) refusal and addressing a new issue raised by Applicant's proposed amendment to the identification of goods. When the Examining Attorney issued a subsequent final Office action as to the Section 2(d) refusal and requirement for an acceptable identification of goods, the appeal resumed. Applicant then requested remand, which was granted, and the identification of goods requirement was eventually resolved by Examiner's Amendment; however, reconsideration of the Section 2(d) refusal was denied and the appeal was again resumed. The appeal is now fully briefed.

We affirm the refusal to register.

## I.    Likelihood of Confusion

Section 2(d) of the Trademark Act prohibits registration of a mark that so resembles a registered mark as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, mistake, or deception. 15 U.S.C. § 1052(d). Our determination under Section 2(d) involves an analysis of all probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) ("*DuPont*," setting forth factors to be considered and referred to as "*DuPont* factors"), *cited in B&B Hardware, Inc. v. Hargis Indus., Inc.,* 575 U.S. 138, 113 USPQ2d 2045, 2049 (2015). *See also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003).

In any likelihood of confusion analysis, different *DuPont* factors may play a dominant role and some factors may not be relevant. *Naterra Int'l, Inc. v. Bensalem,*

92 F.4th 1113, 2024 USPQ2d 293, at *2 (Fed. Cir. 2024) (quoting *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 2022 USPQ2d 513, at *7 (Fed. Cir. 2022)). Similarly, varying weight may be assigned to each factor depending on the evidence presented, and "any one of the factors may control a particular case." *Id.; see also In re Charger Ventures LLC*, 64 F.4th 1375, 2023 USPQ2d 451, at *4 (Fed. Cir. 2023). While we consider each *DuPont* factor for which there is evidence and argument, *In re Guild Mortg. Co.,* 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019), two key considerations are the similarities between the marks and the similarities between the goods. *In re i.am.symbolic, llc*, 866 F.3d 1315, 123 USPQ2d 1744, 1747 (Fed. Cir. 2017) (quoting *Herbko Int'l, Inc. v. Kappa Books, Inc.*, 308 F.3d 1156, 64 USPQ2d 1375, 1380 (Fed. Cir. 2002)). These factors, and others, are discussed below. When analyzing these factors, the overriding concerns are not only to prevent buyer confusion as to the source of the goods, but also to protect the registrant from adverse commercial impact due to use of a similar mark by a newcomer. *See In re Shell Oil Co.*, 992 F.2d 1204, 26 USPQ2d 1687, 1690 (Fed. Cir. 1993).

### A. Similarity of the Marks

Under the first *DuPont* factor, we compare the marks "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay Imps. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1691 (Fed. Cir. 2005) (quoting *DuPont*, 177 USPQ at 567). "Similarity in any one of these elements may be sufficient to find the marks confusingly similar." *In re Inn at*

*St. John's, LLC*, 126 USPQ2d 1742, 1746 (TTAB 2018) (quoting *In re Davia*, 110 USPQ2d 1810, 1812 (TTAB 2014)), *aff'd mem.*, 777 F. App'x 516 (Fed. Cir. 2019).

The standard-character UPC marks in the application and cited registration are identical in all aspects, and the first *DuPont* factor therefore weighs heavily in favor of a likelihood of confusion. *See, e.g., In re i.am.symbolic, llc*, 123 USPQ2d at 1748 (citing *In re Majestic Distilling Co.*, 65 USPQ2d at 1204 (Fed. Cir. 2003) (explaining that "when word marks are identical but neither suggestive nor descriptive of the goods associated with them, the first *DuPont* factor weighs heavily against the applicant")).

### B. Similarity or Dissimilarity and Nature of the Goods

The second *DuPont* factor considers the similarity or dissimilarity and nature of the goods as described in the involved application and cited registration, *DuPont*, 117 USPQ at 567, and contemplates whether the consuming public may perceive the respective goods as related enough to cause confusion about their source or origin. *Naterra Int'l v. Bensalem*, 2024 USPQ2d 293, at *2 (quoting *In re St. Helena Hosp.*, 774 F.3d 747, 113 USPQ2d 1082, 1086 (Fed. Cir. 2014)) (cleaned up) (citation omitted).

The goods need not be identical or even competitive to find a likelihood of confusion. *On-line Careline Inc. v. Am. Online Inc.*, 229 F.3d 1080, 56 USPQ2d 1471, 1475 (Fed. Cir. 2000); *Recot, Inc. v. Becton*, 214 F.3d 1322, 54 USPQ2d 1894, 1898 (Fed. Cir. 2000). They need only be "related in some manner and/or if the circumstances surrounding their marketing are such that they could give rise to the

mistaken belief that [the goods] emanate from the same source." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1722 (Fed. Cir. 2012) (quoting *7-Eleven Inc. v. Wechsler*, 83 USPQ2d 1715, 1724 (TTAB 2007)). The issue is not whether purchasers would confuse the goods, but rather whether there is a likelihood of confusion as to the source of these goods. *L'Oreal S.A. v. Marcon*, 102 USPQ2d 1434, 1439 (TTAB 2012); *In re Rexel Inc.*, 223 USPQ 830 (TTAB 1984). "It is sufficient for finding a likelihood of confusion if relatedness is established for any item encompassed by the identification of goods within a particular class in the application." *In re Aquamar, Inc.*, 115 USPQ2d 1122, 1126 n.5 (TTAB 2015); *see also Tuxedo Monopoly, Inc. v. Gen. Mills Fun Grp.*, 648 F.2d 1335, 209 USPQ 986, 988 (CCPA 1981).

Where identical marks are involved, as is the case here, the degree of similarity between the goods required to support a finding of likelihood of confusion declines. *In re Country Oven, Inc.*, 2019 USPQ2d 443903, at *5 (TTAB 2019) (citing *In re i.am.symbolic, llc*, 116 USPQ2d 1406, 1411 (TTAB 2015) (citing *Shell Oil*, 26 USPQ2d at 1689), *aff'd*, 866 F.3d 1315, 123 USPQ2d 1744 (Fed. Cir. 2017)). Evidence of relatedness may include excerpts from computer databases showing that the relevant goods are used together or used by the same purchasers, and advertisements showing that the relevant goods are advertised together or sold by the same manufacturer or dealer. *See, e.g., In re Davia*, 110 USPQ2d at 1817 (finding pepper sauce and agave related where evidence showed both were used for the same purpose in the same

recipes and thus consumers were likely to purchase the products at the same time and in the same stores).

The identification of goods in the application as originally filed listed several complete electronic goods such as computer monitors, video monitors, televisions, and smartphones; various display panels and video display screens; and display screens sold as an integral component of some electronics.[3] Most of the original identification was acceptable as written, but in the first Office Action the Examining Attorney required that two of the identified display screens (i.e., those used in digital cameras and those sold as an integral component of smartphones) be clarified to specify the type of screen.[4] Applicant responded with an acceptable amendment, specifying those two goods were "electronic" display screens, which satisfied the requirement.[5] After the Examining Attorney issued a final Section 2(d) refusal, Applicant filed two voluntary amendments to the identification "in an effort to advance [its] application and avoid the need for . . . an appeal."[6] When the Examining Attorney rejected the proposed amendments as exceeding the scope of the previously accepted

---

[3] February 1, 2021 Application at 1. In this decision, citations to the prosecution record refer to the .pdf version of that entry in the TSDR system. *See, e.g., In re Seminole Tribe of Fla.*, 2023 USPQ2d 631, at \*1 n.1 (TTAB 2023); *In re Integra Biosciences Corp.*, 2022 USPQ2d 93, \*7 (TTAB 2022). Citations to the briefs in the appeal record refer to the TTABVUE docket system.

[4] August 20, 2021 Office Action at 3.

[5] February 16, 2022 Response to Office Action (amending the goods); May 12, 2022 Final Office Action (noting the requirement for an acceptable identification had been satisfied).

[6] October 21, 2022 Request for Reconsideration at 1 (quote), 2 (first voluntary amendment); October 24, 2022 Preliminary Amendment at 1-2 (second voluntary amendment).

identification,[7] Applicant proposed yet another amendment "to emphasize that its goods are unfinished products, namely, particular types of display screens, all intended as components of finished consumer products."[8] The Examining Attorney accepted the final amendment, but maintained the Section 2(d) refusal based on the identification of goods as finally amended to components.[9]

The current identification of goods in the application (as finally amended) is:

> Electric luminescent display panels, Light emitting diode (LED) displays, OLED (organic light emitting diode) display panels, flat panel display screens, and LCD large-screen displays, all as components of computer monitors, digital signage, digital signage display panels, video monitors, television monitors, televisions, smartphones, wearable video display monitors, video screens, and cameras; Electronic display screens as a component of digital cameras; Electronic display screens sold as an integral component of smart phones; Display panels as a component of televisions in the nature of Liquid crystal display (LCD) televisions and flat panel display screens; Flexible flat panel displays as a component of computers; Video display screens as a component of portable communications apparatus, namely, smartphones, tablet computers and smart watches, in International Class 9.

Put simply, these goods include various display panels and display screens as components of electronics such as computers, tablet computers, computer monitors,

---

[7] December 7, 2022 Non-Final Action at 4-5; February 10, 2023 Subsequent Final Action at 5-6.

[8] 6 TTABVUE 3 (Request for Remand, filed March 8, 2023).

[9] June 9, 2023 Examiner's Amendment at 1-2 (entering the proposed amendment); July 10, 2023 Request for Reconsideration Denied at 2 (noting that the requirement for an acceptable identification of goods had been obviated, but maintaining and continuing the Section 2(d) refusal).

televisions, and smartphones. The goods in the cited registration include charging cables and power connectors.

The Examining Attorney contends that the goods are related because they are used together and "sold together as part of the same finished product" with the relevant goods often "highlighted or called-out in advertising as being a prominent feature of finished products," especially the display panels and power cables of computer monitors.[10] The Examining Attorney continues, contending that "[c]harging cables or power connectors are used in conjunction with monitors or laptops that feature display screen components to simply turn on or charge products."[11] In support of this position, the Examining Attorney attached excerpts of several third-party websites to the Office Actions. For example,

- Dell's UltraSharp monitor includes a "Full HD (1920x1080) resolution on a 23.8" screen," features an "AC power connector" among other cable connectors (e.g., "HDMI connector," two "DP connector[s]"), and comes with a "power cable." There is extensive information about the display panel, including its viewable size, native resolution, pixels per inch, contrast ratio, backlight technology, and more. The monitor comes with "free panel replacement during the Limited Hardware Warranty period even if only one bright pixel is found."[12]

- LG's B1 65-inch class television includes multiple gaming features, self-lighting OLED Display panel with 4K Ultra HD (3840x2160), wide viewing angle, perfect black, intense color, infinite contrast, billion rich colors, and pixel level dimming; features multiple cable connectors (e.g., two rear and two side HDMI connectors, one rear RF connection input); and comes with a power cable.[13]

---

[10] 12 TTABVUE 6.

[11] 12 TTABVUE 6.

[12] August 20, 2021 Office Action at 8-13 (dell.com).

[13] August 20, 2021 Office Action at 14-16 (lg.com).

- HP's Z24f G3 monitor includes an IPS (in-lane switching) display, multiple signal input connectors (e.g., one HDMI connector, four USB-A connectors), and an "AC power cord." There is detailed information about the display, such as the native resolution, contrast ratio, brightness, and pixel pitch; and the power supply (100-240 VAC 50/60 Hz).[14]

- Apple's Studio Display includes a 27-inch 5K Retina display with either standard or nano-texture glass, and comes with a 1-meter cable.[15]

Many of the third-party websites reflect the Examining Attorney's observation that the display panel or display screen component of the finished electronic goods (e.g., computers and monitors) is highlighted as an important feature. The purveyors of the finished products tout the components as a selling point. For example, a Lenovo 24.5-inch LED antiglare gaming monitor with HDMI and DisplayPort input connectors is advertised as having an "[e]fficient screen [that] uses LEDs to provide precise backlighting to pixels";[16] and a Corsair 32-inch 4K UHD monitor with "a wide range of connection options" and an included power cable is advertised as containing an "ultra-slim . . . display with IPS LED technology" which "[o]ffers superb color accuracy and consistency regardless of viewing angle, up to 178° horizontally and vertically."[17] Similarly, the Razer website specifies many of the individual components in the Razer gaming laptop computer including a QHD 240Hz OLED display as well as USB-C 3.2 Gen 2 power cables.[18] As demonstrated by the evidence, the goods are related because they are each incorporated and used in the same

---

[14] August 20, 2021 Office Action at 17 (hp.com).

[15] May 12, 2022 Office Action at 20-21 (apple.com).

[16] July 10, 2023 Request for Reconsideration Denied at 16-18.

[17] July 10, 2023 Request for Reconsideration Denied at 41-44.

[18] July 10, 2023 Request for Reconsideration Denied at 27-28.

finished electronic products. *See, e.g., GAF Corp. v. Polychrome Corp.*, 198 USPQ 637, 639 (TTAB 1978) (synthetic resins and ultraviolet light absorbers related as "both are purchased by the same customers who incorporate them into a finished product"), *aff'd mem. unpubl. op. sub nom. BASF Wyandotte Corp. v. Polychrome Corp.*, 599 F.2d 1060 (table) (CCPA 1979); *In re Globe-Union Inc.*, 189 USPQ 158, 159 (TTAB 1975) ("Applicant's resistor-capacitors and registrant's ceramic condensers are closely related electronic components that obviously would be sold . . . for incorporation in the same piece of electronic equipment or apparatus.").[19]

Likening this appeal to *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059 (Fed. Cir. 2003) and *St. Helena Hosp.*, 113 USPQ2d 1082, Applicant contends that the Examining Attorney is required to present "something more":

> The Examining Attorney's evidence shows power cables and televisions or monitors may be sold by the same companies . . . [and] that these televisions and monitors may feature LED display panels. However, . . . the fact that some monitors and television manufacturers also sell power cables does not alone imply that consumers will assume that all monitors and televisions have the same source of origin as the power cables. Therefore, "something

---

[19] Somewhat analogously, it has long been recognized that the sale of both a finished product and a component part of that product under the same or similar marks may give rise to confusion. *See, e.g., In re Davey Prods. Pty Ltd.*, 92 USPQ2d 1198, 1203 (TTAB 2009) (finding that goods identified as "electric motors for machines" were related to goods identified as "air compressors and parts therefor" because "the record show[ed] that an electric motor is or can be an essential component and/or replacement part of an air compressor"); *Teledyne Techs., Inc. v. W. Skyways, Inc.*, 78 USPQ2d 1203, 1207 (TTAB 2006) (finding that ignition harnesses for piston aircraft engines and aircraft engines were "commercially related" because harnesses were a component part of aircraft engines); *In re Int'l Tel. & Tel. Corp.*, 197 USPQ 910, 911 (TTAB 1978) (finding a likelihood of confusion arising from use of THUNDERBOLT for cartridge heaters and THOR'S 3 IN 1 THUNDERBOLT and design for electrically energized ovens because "there exists an intimate relationship between a finished product such as registrant's oven and the component parts which comprise such oven such as applicant's cartridge heater").

more" is required to show relatedness between monitors or televisions and power cables.[20]

Applicant's reliance on *Coors Brewing Co.* and *St. Helena Hosp.* is misplaced. Those opinions involved the question of relatedness of goods and services, limiting the requirement for "something more" to circumstances where goods are used in the rendering of services and the relatedness of the goods and services is not evident, well known, or generally recognized. *See St. Helena Hosp.*, 113 USPQ2d at 1087 (finding that substantial evidence did not support relatedness of hospital-based residential weight and lifestyle program and printed materials dealing with physical activity and fitness). *See also Country Oven*, 2019 USPQ2d 443903, at *11-13 (explaining the rationales in *Coors Brewing Co.* and *St. Helena Hosp.*). Applicant's argument seeks to extend the limited, "something more" principle discussed in *Coors Brewing Co.* and *St. Helena Hosp.* to circumstances involving a comparison of goods, which goes beyond its intended application. *See In re Halo Leather Ltd.*, 735 F. App'x 722, 727-28 (Fed. Cir. 2018) (rejecting the appellant's argument that "something more" is required in a case involving only goods).

The second *DuPont* factor favors a finding of likelihood of confusion.

C.    Trade Channels, Classes of Consumers, and Purchasing Decisions

The third *DuPont* factor considers the "similarity or dissimilarity of established, likely-to-continue trade channels," and the fourth factor concerns the "conditions

---

[20] 10 TTABVUE 13-14.

under which and buyers to whom sales are made, i.e. 'impulse' v. careful, sophisticated purchasing." *DuPont*, 177 USPQ at 567.

Applicant contends that the wording "as components of," "as a component of," and "as an integral component of" in its amended identification of goods is a meaningful limitation which "limit[s] the goods with respect to trade channels and class of purchasers, and . . . represent[s] that the goods will be marketed in a particular, limited way through particular, limited trade channels, to a particular class of customers."[21] Applicant repeatedly argues that its component goods "are sold exclusively to manufacturers of electronic consumer products,"[22] "are for manufacturing," are "sold to the manufacturer of the finished product," and "are sold business-to-business as components to be assembled and incorporated into finished consumer products, which would then be sold to retail customers."[23] Applicant argues that Registrant's goods, in contrast, "are sold in conjunction with finished products but are also finished products themselves and may be purchased separately by retail customers," and that the Examining Attorney's evidence establishes that Registrant's charging cables "are for consumer use" and "are generally retail products."[24]

Applicant's goods clearly are components of other finished products. However, we cannot read into the application the limitation as to classes of consumers and channels of trade which Applicant contends are implicit because no explicit

---

[21] 13 TTABVUE 6.

[22] 10 TTABVUE 17.

[23] 13 TTABVUE 7, 8-9.

[24] 13 TTABVUE 7, 8, 9.

restrictions are included in the identification.[25] *In re FCA US LLC,* 126 USPQ2d 1214, 1217 (TTAB 2018) ("[W]here an application contains no such restrictions, examining attorneys and the Board must read the application to cover all goods of the type identified, to be marketed through all normal trade channels, and to be offered to all normal customers therefor."). Where the identification uses the language "as a component of" or "all as components of," the identified goods may encompass both goods sold as a component of a finished product or sold separately from the finished product for use as a component as, for example, when a purchaser is replacing a component of a product.[26] Such goods may be available to original equipment manufacturers ("OEM") as well as to end users and hobbyists who wish to build, repair, or customize their own electronics.

Because the relevant goods in the cited registration are unrestricted as to trade channels and classes of purchasers, we must presume that they travel in the ordinary trade and distribution channels for the goods and to all usual classes of consumers. *See Cai v. Diamond Hong*, 901 F.3d 1367, 127 USPQ2d 1797, 1801 (Fed. Cir. 2018); *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1846 (Fed. Cir.

---

[25] *See* TMEP § 1402.06(a) for permissible limitations to identifications of goods and services.

[26] Classification of goods that are identified as components depends on whether they are sold as a part of a finished product or sold separately from a finished product. TMEP § 1402.05(a). Component parts sold as part of a finished product are in the class of the finished product, while component parts sold separately are in the class of the specified components. *Id.* It is possible that a component product may be classified differently depending on whether it is sold as a part of another finished product or a separate component. However, because both the component parts and finished products identified in the instant application are properly classified in International Class 9, the use of language that encompasses both component parts sold as part of a finished product and as a separate component does not raise a classification issue in the case at hand.

2000) (affirming Board finding that where the identification is unrestricted, "we must deem the goods to travel in all appropriate trade channels to all potential purchasers of such goods"). There is also no restriction or limitation to Registrant's cable connectors, charging cables, and power connectors; therefore, we must disregard Applicant's implication that that the evidence of record establishes that Registrant's charging cables are generally retail products likely sold only to retail consumers. Just as we could not read a limitation into Applicant's identification, we cannot read such a limitation into the unrestricted identification of the registration by resorting to extrinsic evidence; we must rely on the identification alone. *See In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1053 (Fed. Cir. 2018) (noting the impermissibility of an applicant's attempt to restrict the breadth of the goods or trade channels described in the cited registration). Further, even if we could read the registration's identification as so restricted, it would not preclude overlap in the prospective consumers of Applicant's and Registrant's goods.

Because there is no restriction to the cable connectors, charging cables, and power connectors in the cited registration, they may be sold in the same manner Applicant claims its component goods are sold – to the manufacturer of a finished electronic product (i.e., sold business-to-business and incorporated into a finished consumer product which would then be sold to retail customers), to end users or hobbyists who wish to build, repair, or customize their own electronics, or in connection with finished electronic products.[27] Applicant appears to acknowledge this as a possibility

---

[27] 13 TTABVUE 7, 8-9.

with its recognition that charging cables and power connectors "are sold in conjunction with finished products."[28]

In addition, the relevant classes of purchasers for both Applicant's and Registrant's goods include the ultimate end users, that is, the users of the completed electronic items, and travel through the same trade channels.[29] *See In re Dell*, 71 USPQ2d 1725, 1728-29 (TTAB 2004) (specimen for goods identified as a component part of a finished product showed the finished product in a retail webpage display of the goods); *see also, e.g., In re Infinity Broad. Corp. of Dall.*, 60 USPQ2d 1214, 1218 (TTAB 2001) (even if initial purchasers of radio and television advertising time are sophisticated and careful purchasers, in determining likelihood of confusion consideration must also be given to the ultimate users, i.e., the viewers and listeners of television and radio stations); *In re Artic Elec. Co., Ltd.*, 220 USPQ 836, 837-38 (TTAB 1983) (likelihood of confusion can be found by the initial purchasers as well as the ultimate users of arcade games and coin and bill changer equipment). Thus, the goods identified in both the application and the registration may be sold to OEMs, end users, or hobbyists who use the components to build, repair, or customize electronic products, or as components integrated into or goods sold with a finished product, and sold through the trade channels of such finished products. Therefore, the trade channels and consumers are the same.

---

[28] 13 TTABVUE 9.

[29] *See, e.g.*, August 20, 2021 Office Action at 8-13 (dell.com), 14-16 (lg.com), 17 (hp.com); May 12, 2022 Office Action at 21 (apple.com); July 10, 2023 Request for Reconsideration Denied at 16-18 (bestbuy.com), 27-28 (razer.com), 41-44 (bestbuy.com).

Applicant argues that even if Applicant's components and Registrant's components and finished goods "were sold and marketed in the same business-to-business trade channels, confusion would be unlikely because the relevant consumers are highly sophisticated," with purchasing decisions "made by separate departments [specializing in specific kinds of technology] or, at the very least, by individuals with different training and specialized knowledge" and only after "long-term negotiations and direct communications."[30]

Even if this class of initial business purchaser or OEM is sophisticated, the relevant classes of consumers include the potentially less sophisticated ultimate end users of the completed electronic items, as well as hobbyists and gamers who do their own builds or repairs. *See Infinity Broad. Corp. of Dall.*, 60 USPQ2d at 1218-19 (citing, inter alia, *Payless Shoesource Inc. v. Reebok Int'l Ltd.*, 998 F.2d 985, 27 USPQ2d 1516, 1519 (Fed. Cir. 1993); *Elec. Design & Sales Inc. v. Elec. Data Sys. Corp.*, 954 F.2d 713, 21 USPQ2d 1388, 1390 (Fed. Cir. 1992)). When the relevant consumer includes both professionals and the general public, the standard of care for purchasing the goods is that of the least sophisticated potential purchaser. *Stone Lion Cap. Partners, LP v. Lion Cap. LLP*, 746 F.3d 1317, 110 USPQ2d 1157, 1162-63 (Fed. Cir. 2014). Thus, for purposes of the likelihood of confusion analysis under Section 2(d), the relevant consumers include ordinary consumers who presumably would be less sophisticated than initial electronics manufacturing purchasing agents, and who are unlikely to exercise more than an ordinary degree of care in deciding to purchase

---

[30] 13 TTABVUE 10.

an electronic device. *See In re Medline Indus., Inc.*, 2020 USPQ2d 10237, *8 n.31 (TTAB 2020) (citing *HRL Assocs. Inc. v. Weiss Assocs. Inc.*, 12 USPQ2d 1819, 1822 (TTAB 1989), *aff'd*, 902 F.2d 1546, 14 USPQ2d 1840 (Fed. Cir. 1990) (post-sale confusion as well as point-of-sale confusion is recognized).

Also, Applicant's arguments under this factor are unsupported, as there is no evidence demonstrating how purchasing decisions are made by electronics manufacturers, nor demonstrating the level of sophistication of electronics manufacturers, or of consumers of complete electronics such as computers, tablet computers, computer monitors, televisions, and smartphones, or their components. *Cai v. Diamond Hong*, 127 USPQ2d at 1799 ("Attorney argument is no substitute for evidence."); *WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 104 USPQ2d 1024, 1033 (Fed. Cir. 2012) ("Arguments of counsel cannot take the place of evidence lacking in the record.").

The third *DuPont* factor favors a finding of likelihood of confusion. However, because there is nothing in the record to show that the least sophisticated purchasers of the identified goods would exercise anything more than ordinary care, the fourth *DuPont* factor is neutral.

### D.    Balancing the *DuPont* Factors

When we consider and weigh the evidence of record and the relevant likelihood of confusion factors, *Charger Ventures*, 2023 USPQ2d 451, at *7 ("[I]t is important . . . that the Board . . . weigh the *DuPont* factors used in its analysis and explain the

results of that weighing."), we find confusion is likely between Applicant's mark and the cited mark.

We have found the marks to be identical, which weighs heavily in favor of a likelihood of confusion. We have found the goods to be related and to move in at least overlapping channels of trade. These factors also weigh in favor of a likelihood of confusion. We have also found the goods are sold to some of the same classes of consumers, and otherwise ultimately reach the same end users. Because the relevant consumers would exercise only ordinary care in making purchasing decisions, we treat this factor as neutral.[31] Balancing the factors, we find that confusion is likely.

## II. Decision

The Section 2(d) refusal to register Applicant's mark UPC is affirmed.

---

[31] Even if we were to consider an elevated degree of care in purchasing for electronics manufacturers under the fourth factor, we still would find confusion likely given the identical marks, relatedness of the goods, and overlap in trade channels and consumers. *See, e.g., Cunningham*, 55 USPQ2d at 1846 (alleged sophistication of golfers was outweighed by the Board's findings of strong similarity of marks and identity of goods); *In re Research & Trading Corp.*, 793 F.2d 1276, 230 USPQ 49, 50 (Fed. Cir. 1986) (quoting *Carlisle Chem. Works, Inc. v. Hardman & Holden Ltd.*, 434 F.2d 1403, 168 USPQ 110, 112 (CCPA 1970) ("That the relevant class of buyers may exercise care does not necessarily impose on that class the responsibility of distinguishing between similar trademarks for similar goods. 'Human memories even of discriminating purchasers . . . are not infallible.'"); *In re i.am.symbolic, llc*, 116 USPQ2d at 1413 ("The identity of the marks and the relatedness of the goods sold thereunder outweigh any presumed sophisticated purchasing decision.").